**Tony Greg BARIL, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Supreme Court of Kentucky.

Feb. 17, 1981.

Rehearing Denied April 14, 1981.

Bart Adams, Paula Bierley, Louisville, for appellant.

Steven L. Beshear, Atty. Gen., Robert W. Hensley, Asst. Atty. Gen., Frankfort, for appellee.

STEPHENS, Justice.

Tony Greg Baril was convicted of murder and robbery by a Floyd County jury and was sentenced to 30 years in prison. His appeal to this court is a matter of right.

Sometime during the late hours of Sunday, August 13, 1978, the TCT Truck Stop in Prestonsburg was robbed, and Chester Porter, an employee, was stabbed to death. Appellant was arrested on August 15, 1978, and was indicted by the grand jury on August 31, 1978. A trial was held in August of 1979, and because the jury was unable to reach a verdict a mistrial was declared. The second trial held in January of 1980 resulted in Baril's conviction.

Numerous grounds for reversal are urged which will be discussed in the following order: (1) the appellant was entitled to a directed verdict of not guilty; (2) the trial court erred in failing to suppress appellant's tennis shoes which matched a bloody footprint at the scene of the crime and which contained a blood type identical to that of the decedent; (3) the trial court erred in failing to suppress certain oral statements of appellant allegedly given in violation of his rights to counsel and against self-incrimination, and (4) the trial court erred in admitting certain other prejudicial evidence.

I

WAS THE APPELLANT ENTITLED TO A DIRECTED VERDICT OF NOT GUILTY?

At about 11:30 p. m., on Sunday, August 13, 1978, Timothy Hicks, a customer, went into the TCT Truck Stop and saw the body of Chester Porter lying face down in a pool of blood. He immediately left the scene and called local authorities for assistance. When he returned, he observed a distinct bloody footprint (made by a tennis shoe) which he had not seen before. At about 1:30 a. m., on August 14, 1980, while the police were on the scene, appellant appeared and tried several times to persuade the police to permit him to enter the premises. He was questioned briefly and told to leave. According to Mrs. Edna Baril, appellant's mother, her son had come home about 11:30 p. m. on August 13, and his tennis shoes and the cuffs of his bluejeans were wet. He told his mother that Chester Porter had been either shot or stabbed.

Testifying in his own defense, Baril admitted that he had gone to the truckstop late in the evening of August 13, and had seen Chester Porter "dead." He said that he had, in effect, panicked and left the scene. He stopped his van and hid his long knife behind a large rock on a local river bank. He admitted walking in the river and that there was a "possibility" that there was blood on his shoes and jeans. He emphatically denied having killed Porter. There was other inculpatory evidence which will be discussed later.

■ While this court is not impressed with the quality and quantity of the evidence presented by the Commonwealth, we cannot say that under the evidence as a whole it would be clearly unreasonable for a jury to find the defendant guilty. *Trowel v. Commonwealth*, Ky., 550 S.W.2d 530

(1977); *Rutland v. Commonwealth*, Ky., 590 S.W.2d 682 (1979). We therefore conclude that the trial judge was correct in denying Baril's motion for a directed verdict of acquittal.

## II

## SHOULD THE EVIDENCE CONCERNING APPELLANT'S TENNIS SHOES HAVE BEEN SUPPRESSED?

The basis for this contention stems from an incident that ultimately led to the arrest of Baril for the murder. From an examination of the transcript of a pretrial suppression hearing and a second suppression hearing during the second trial, we have determined the following sequence of events. On Tuesday, August 15, 1978, rather late in the afternoon, appellant and a friend were driving in Baril's van on US 23 between Prestonsburg and Pikeville. State Trooper Shelton, who had participated in the investigation of the robbery-murder in question, received a radio message which informed him that if he wanted to talk to Tony Baril he (Shelton) could find Baril driving on US 23. Shelton had in his possession a duplicate of Baril's driver's license which had been found on the side of the highway not too far from the murder scene. Shelton spotted Baril's van and followed it for nearly two miles. He testified that he observed the van to be weaving on the highway and smoking. He stopped the van and asked Baril, the driver, for his license which Baril produced.

While Baril was still in the van, the trooper smelled alcohol on his breath and noticed open beer cans setting on a cooler behind the driver's seat. He then asked Baril to step out of the van, and when he did the trooper noticed that Baril had on tennis shoes and that there was a dark stain near the eyelet of one of them. He then requested Baril to show him the bottom of the tennis shoes which Baril did voluntarily. The soles of the shoes matched the shoe print found at the scene of the murder. At this point, the officer advised Baril of his *Miranda* rights and told him he was a *suspect* in the murder of Chester Porter. Baril then went to the police cruiser and, although there is some conflict in the testimony, the trial court found, and we agree, that Baril voluntarily gave the tennis shoes to the officer.

At this point, Trooper Shelton placed Baril under arrest for a violation of KRS 244.020(1), drinking on a public highway, even though he later admitted that he had not actually seen Baril take a drink while either driving the van or while it was stopped. On August 16, 1980, Baril pled guilty to the misdemeanor and received a nominal fine. He was assessed court costs and was sentenced to 30 days in the county jail.

The tennis shoes were tested in a laboratory and it was revealed that they matched the bloody footprint at the murder scene and had blood on them which matched that of the decedent. This inculpatory evidence was admitted to the jury following the two suppression hearings referred to.

Appellant strongly urges that the seizure of the shoes was a violation of his 4th Amendment rights which prohibits unreasonable searches and seizures. The basis for this argument is that Trooper Shelton, while arresting Baril for drinking on a highway, admitted that he did not actually see appellant drinking, which is, of course, the gravamen of the offense. Baril argues that since the misdemeanor was not committed in the trooper's presence, the arrest was illegal and all evidence obtained as a result of the arrest was improperly obtained as being the "fruit of the poisonous tree." Appellant also argues that if the arrest was not illegal, an arrest for a traffic offense does not justify a complete search of the vehicle or the person. We do not quarrel with the legal propositions as stated, but we believe they are not applicable to this case.

The ultimate questions to be answered are twofold: (1) Did Trooper Shelton have probable cause to stop appellant's van and (2) was the "search" of the tennis shoes proper?

In determining the "probable cause," we are guided by the test in *Pen-*

nington v. Commonwealth, Ky., 429 S.W.2d 364 (1967). We said, in reversing a line of cases, that this "should be done without regard to the pendency or the disposition of the initial offense." *Id.* at 366. It is entirely possible that a defendant may be convicted on a charge when there was not probable cause for the initial arrest or may be acquitted on a charge when there was probable cause. *"Therefore, the outcome of the trial on the major offense should not be determined by the disposition of the arresting charge."* *Id.* (emphasis added). In the present case, Trooper Shelton had possession of appellant's driver's license, observed him weaving on the highway and saw the van smoking. Any or all of these gave the officer an absolute right to stop the van. Under the principles of *Pennington, supra,* it is irrelevant that appellant was charged with another offense.

■ Having concluded that the stopping was proper, we now address ourselves to the inspection or "search" of the tennis shoes. In this jurisdiction, a search implies a prying into hidden places for that which is concealed. It is not a search if the object is open to view. *Nichols v. Commonwealth,* Ky., 408 S.W.2d 189 (1966). As stated, the trooper saw a dark spot on appellant's tennis shoe as he was alighting from the van. The shoe was in plain view of the officer who had an absolute right to be there. The action of the officer was not a search within the purview of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The trooper had been part of the investigation of Chester Porter's murder and wanted to question appellant of any possible knowledge he might have about the crime. At the time of this of stopping appellant's van, the officer did not, however, consider appellant a suspect. His request of the appellant to see the bottom of his shoe occurred following a legal stop of appellant's vehicle. The voluntary viewing of the sole of the shoe did not convert the "search" into a general or exploratory one

"seeking out hidden places."[1] The damage, if any, to the protection of the 4th Amendment is negligible. See the tests set out in *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). We conclude that the stopping of appellant and the inspection of the sole of his tennis shoe was proper.

■ It is undisputed that the officer, immediately after seeing the sole of the tennis shoe, gave appellant notice that he was a suspect of the crime of murder and further read to him his *Miranda* rights. Following this, as we stated, he voluntarily gave his tennis shoes to the officer. Since the surrender of the shoes was voluntary and since appellant knew of his rights, we find no error in this part of the event.

### III

DID THE TRIAL COURT ERR WHEN IT FAILED TO SUPPRESS EVIDENCE OF VOCAL STATEMENTS MADE BY APPELLANT IN VIOLATION OF HIS RIGHT TO COUNSEL?

Following his arrest on August 15, 1978, but prior to any formal charges being brought against him, appellant was questioned by a Kentucky State Police detective in the office of the Floyd County Commonwealth Attorney. The questioning lasted one and a half to two hours, and was not recorded or reduced to writing. An additional interrogation occurred on the night of August 16, 1978, in response to a request by appellant to "see an investigator." Present at this session was the county jailer, a county detective and the Commonwealth attorney. This interrogation was also not recorded or transcribed.

While there is some conflict in the evidence, it is clear that appellant, a teenager, broke down and cried several times during the two sessions. He also requested an attorney once, and almost certainly on sev-

---

1. See *United States v. Richardson,* 388 F.2d 842 (6th Cir. 1968), which held that the examination of a defendant's hands under ultra-violet light to determine if he had touched the stolen bank bags which had been dusted with flourescein powder was not a search within the 4th Amendment.

eral occasions. On August 18, 1980, appellant, while in custody, was served with an arrest warrant charging him with murder. On the same date, the district judge appointed an attorney for him.

We will not belabor this opinion with a repetition of the basic and the obvious—viz, that the assistance of counsel is indispensable to the fair administration of the system of criminal justice. *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). The failure to provide counsel when requested and the continued questioning of the accused is a serious deprivation of the rights of appellant. We cannot countenance or approve of this failure. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Once a defendant requests counsel all questioning must cease. *U. S. v. Crisp*, 435 F.2d 354 (7th Cir. 1970), *cert. denied*, 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 694 (1960). As we view it, the trial judge should have suppressed all oral statements made by appellant relating to the crime following his first request for counsel. Failure to do so is reversible error.

Finally, during the course of the trial, the court admitted evidence about a knife owned by the appellant, which admittedly was not the murder weapon. This was error, and in the event of a retrial such evidence must be excluded. Also, during the course of the trial, a witness, Gordon Moore, testified that certain knives were stolen from his cabin on the night of the murder and that four suspects of that burglary had taken polygraph tests about possible involvement in the murder. All references to polygraph tests should have been excluded.

The judgment of the trial court is reversed with directions to grant appellant a new trial.

PALMORE, C. J., and CLAYTON, LUKOWSKY and STERNBERG, JJ., concur.

AKER, J., not sitting.