Debra TALBOTT, Appellant,

v.

COMMONWEALTH OF KENTUCKY,
Appellee.

No. 96–SC–643–MR.

Supreme Court of Kentucky.

March 19, 1998.

Kimberly A. Brooks, Covington, for Appellant.

A.B. Chandler, III, Attorney General, Ian G. Sonego, Criminal Appellate Division, Office of Attorney General, Frankfort, for Appellee.

COOPER, Justice.

Appellant was convicted in the Hart Circuit Court of complicity to murder and was sentenced to life in prison. She appeals to this Court as a matter of right. Ky. Const. § 110(2)(b).

On January 18, 1995, Appellant filed a missing person report with the Hart County Sheriff regarding her seventeen-year-old daughter, Christina Marie Poper, a/k/a Samantha Moore. She reported that her daughter had been last seen at home on January 16, 1995 at 10:00 p.m.

While searching the Green River area for a missing child on March 5, 1995, members of the Hart County Rescue Squad discovered Christina Poper's body in the Green River just below Rile Bridge near U.S. Highway 31W in Hart County. A subsequent autopsy revealed the cause of death to be a subdural hematoma due to blunt trauma to the head. An assistant state medical examiner testified that the injury could have been caused either by a blow to the head with an object or a fall from a high level to a lower level, but required a significant amount of force under either circumstance. On the same day, Kentucky State Police Detective Stan Harlow proceeded to the Meade County jail and obtained a written statement from Gerald Talbott, Appellant's husband and Christina's stepfather, who had been incarcerated on other charges. Gerald advised that he and Appellant had last seen Christina at about 10:30 p.m. on the night of January 16; that she was not at home when he awoke the next morning, but he assumed she had left for school; that when she did not return from school on January 17, he assumed she was staying overnight with a friend; and when the school reported her absent the next day, he and Appellant filed the missing person report with the sheriff's department.

On March 16, 1995, Harlow returned to the Meade County jail and obtained another written statement from Gerald Talbott, this time in the presence of Gerald's attorney, Vincent Yustas. In this statement, Gerald related that Appellant had killed Christina by unknown means on the night of January 16 and that Gerald's only involvement had been to assist in disposing of the body by helping Appellant dump it off the U.S. 31E bridge into the Green River. Armed with this information, Harlow proceeded to obtain a warrant for Appellant's arrest. Since the circuit judge, the district judge, and the trial commissioner were all out of the county, the warrant was issued by the circuit clerk, Conroy Harris. KRS 15.725(5).

At approximately 11:00 a.m. on March 17, 1995, Harlow proceeded to Appellant's residence with the warrant and knocked on the door. When Appellant answered the door, Harlow notified her that she was under arrest for the murder of Christina Poper. Although Appellant was not interrogated at that time, she was advised of her "*Miranda* rights," *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). She executed a written waiver of those rights, as well as a written consent to the search her residence and premises. The search revealed *inter alia* Christina's eyeglasses and a sleeping bag into which, according to Ger-

ald's statement, Christina's body had been placed for transport from the residence to the U.S. 31E bridge. At approximately 2:30 p.m ., Appellant was taken to the old Hart County jail for booking, following which she was taken to the Larue County jail for incarceration.

While still at the old Hart County jail, Appellant gave Harlow a written statement in which she related that Gerald had killed Christina because they were having a sexual affair and he was afraid Christina might bring criminal charges against him. Appellant claimed in this statement that her only involvement had been to assist Gerald in disposing of the body by helping him dump it off the U.S. 31E bridge into the Green River.

At 4:00 p.m. on March 18, 1995, Appellant contacted Harlow by telephone from the Larue County jail and advised that she wanted to tell him "the whole story." Harlow proceeded to the jail and again advised Appellant of her *Miranda* rights. Appellant then gave Harlow another written statement, this time implicating herself not just in the disposal of Christina's body, but in complicity to the murder, itself. Because Gerald Talbott committed suicide prior to trial and Appellant did not testify in her own defense, Appellant's March 17 and March 18 statements constituted the only evidence introduced at trial describing the events leading up to the death of Christina Poper and the disposal of her body. Because Appellant claims the evidence against her was insufficient to support her conviction, or, in the alternative, that she was acting under the influence of extreme emotional disturbance during her participation in the crime, her March 18 statement is set forth verbatim (with misspellings and punctuation corrected).

On Sunday, Jan. 15, 95, Christina (Sam) went to church. She returned home and wanted to go to Maggie Rexford's house in Hodgenville. I took her there, and then returned home. After being home for awhile, Gerald told me about his relationship with Christina (Sam). She had come on to him in March of 1994. They had sexual contact several months thereafter until Sept. or Oct. 94. I called Kenny Poper, my son, in Wyoming. I asked him if he knew about Gerald and Christina (Sam). He said he did and for me to be careful because Gerald had wanted him (Kenny) to kill me for him. Kenny told me that the reason Gerald broke my nose was because he (Kenny) wouldn't kill me. Also, Gerald had come up with two different plans to kill me. After talking to Kenny, I confronted Gerald again. He told me more at this time. I was more hurt than mad at this time.

I then received a call from a boy I didn't know. He informed me of parties Christina (Sam) had been going to. Most of my anger was toward Sam (Christina). At about 11:00 p.m. EST, Christina (Sam) called home. She wanted to stay all night with her friend. I said she could.

During Sunday afternoon, we discussed how we could get rid of her and not get caught. We talked about shooting her, or choking her. We thought about burying her on our property. We decided not to use a gun because Kenny knew we had one, and I didn't want a mess to clean up. Gerald also talked about breaking her neck.

All during Sunday night, I stayed up. On Monday morning, I called Kenny again and talked with him. Gerald got up and we talked more. We left home and drove to the bridge over Green River. We discussed putting Christina's (Sam's) body in the river. We also looked for a more remote spot. I called Christina (Sam) at Maggie's house. I talked with Maggie. Christina (Sam) was still asleep. I told her I was coming to get Christina (Sam). A short time later, I called back and told Maggie that I would be there at about 4:00 p.m. and that she (Maggie) couldn't come home with us because Christina (Sam) and I had something to discuss. A little after 4:00 p.m. EST, I picked up Christina (Sam). We didn't talk much on the way home. When we got home, we both went inside. Gerald was home. We sat at the kitchen table. Christina (Sam) got something to eat. I told Christina (Sam) to go upstairs to her room and think about anything she had lied about. Later, I went upstairs and confronted her with the par-

ties she had been to. She denied that. She then went downstairs and ate dinner. I went down also. I then confronted Christina (Sam) about the conversation I had had with Kenny. She said Kenny lies. She then went back upstairs. This time I told Gerald to go up with me. We had already planned that this would be a good time to kill her. Gerald had a short metal rod with him when we went upstairs.

Gerald had already made plans because he felt if Christina (Sam) was to leave home and all of this was to come out, he would go to jail and he didn't want to do that for having sex with Christina (Sam). We both felt that our relationship would be better with her out of the way.

When we went upstairs, Christina was on the bed. Gerald went behind the headboard. I sat down on the edge of the bed. I told Christina (Sam) that Gerald had told me everything. She just looked at Gerald. Gerald could not get into position at this time to hit her with the rod. Christina (Sam) got up and looked for notes Gerald had written her. She couldn't find them. Gerald and I went back downstairs. He wanted her to confess to starting the relationship so I would know he wasn't lying. Christina (Sam) came down. She sat at the table and was going to eat a grapefruit. I asked Christina (Sam), "What are we going to do about this problem?" She said we just go on. We did discuss the idea of her going to Maggie's to live.

At about 10—10:30 PM, Christina (Sam) went to bed. Gerald was in bed watching T.V. I sat on the edge of the bed. Gerald said if Christina leaves, he would go to jail. He planned to wait until Christina (Sam) went to sleep. He would go up to her room and have me on the stairs. He wanted to wake her and discuss their relationship so I could hear the truth. We laid in bed until 12:30 AM. Gerald went up. There was no light on. I went up part way then came back down to use the bathroom. Gerald was using his lighter to see by when I went back up. I heard Christina (Sam) say I really did love you to Gerald and said don't hurt me. At this point, Gerald reached over to a T.V. and turned it on so he could have some light. He was

on top of her sitting on her legs. He was choking her with both hands. Her feet were at the head board and she was nude. Christina (Sam) was making a gurgling sound. I was at the top of the steps watching. Gerald told me to go downstairs and get a stick of wood from the wood pile. I went downstairs and got the stick of wood, took it back upstairs, and gave it to Gerald. I also handed him a pillow. Gerald wanted to put the pillow over her head and then hit her with the wood. By doing this, it wouldn't leave a mark on her head. Gerald said his hands were hurting from choking her and she was dying slowly. He hit her about six times, then he wanted me to check her. I did check her pulse and didn't hear a heartbeat. We then got dressed and then dressed her. Gerald got a sleeping bag and put it in the back of the truck. He went upstairs and carried her downstairs. He sat her in a chair and got a better grip on her. He then took her to the truck and put her in the bed. He pulled the sleeping bag over her.

We got in the truck and drove to the bridge. Gerald drove. When we got there, we stopped over the river. Gerald had told me at the house he needed my help because Christina (Sam) was such a lard ass. We got out and both of us got her out of the truck bed. We then set her up on the concrete railing, then pushed her over. Gerald watched as she went down and said she hit the water flat. I got the sleeping bag and put it in the truck cab. He got in and we left. We then drove to Horse Cave and got some gas. We then took a different route home. We got home at 4:00 AM EST. Gerald went to bed. I stayed up until about 7—7:30 AM then fell asleep. Later, I took off the bed sheet and pillow case and washed them. I then put them back on the bed.

We had already made up a story to the Sheriff about her missing.

/s/ Debra L. Talbott

## I. VALIDITY OF ARREST

Appellant asserts that the warrant for her arrest was invalid and that the evidence ob-

tained as a result of her subsequent consent to search, as well as her written statements, should have been suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).

The affidavit executed by Detective Harlow in support of the arrest warrant contained only the following recitation:

> The affiant, *Stan Harlow, Kentucky State Police,* says that on *January 17, 1995,* in Hart County, Kentucky the above-named defendant unlawfully: *with the intent to cause the death of another person, she caused the death of such person by killing Christina Marie Poper on Tuesday, January 17, 1995.*

The criminal complaint is a printed form. The underlined portion of the affidavit represents information supplied by the affiant to fill in the blank spaces on the form.

■ This type of "ultimate fact" affidavit would be sufficient if based upon the personal knowledge of the affiant. *Huff v. Knauf,* 313 Ky. 660, 233 S.W.2d 276 (1950); *cf. Harvey v. Commonwealth,* 226 Ky. 36, 10 S.W.2d 471 (1928). However, if information concerning the alleged offense was obtained from someone other than the affiant, the affidavit must disclose that fact. *Whiteley v. Warden,* 401 U.S. 560, 568–69, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971); *Emberton v. Commonwealth,* Ky., 269 S.W.2d 206 (1954). The Commonwealth argues unconvincingly that the warrant must be valid, because it complies with Official Form 1 attached to the criminal rules. However, even the Attorney General has opined otherwise:

> In order for a complaint not based on the personal observation of the affiant to be sufficient to support a warrant of arrest, it must disclose (1) the name of the informant, (2) the factual observation he has made and not just the "ultimate fact" of the offense, and (3) how, when and where such observation was made.

OAG 65–275. It is not the fill-in-the-blanks form, but the information used to fill in the blanks, which rendered the criminal complaint insufficient in this case. Since the affidavit was insufficient to support a finding of probable cause, the warrant was invalid, thus provided no basis for Appellant's arrest. Ky. Const. § 10; *Whiteley v. Warden, supra; Patrick v. Commonwealth,* Ky., 238 S.W.2d 1006 (1951); *Harvey v. Commonwealth, supra.*

■ However, despite the invalidity of the warrant, the arrest was valid if Harlow, himself, had probable cause to believe that Appellant had committed a felony. KRS 431.005(1)(c); *United States v. Calandrella,* 605 F.2d 236, 246 (6th Cir.1979), *cert. denied, Kaye v. United States,* 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979). As with respect to the sufficiency of information to support probable cause to issue a warrant, information constituting probable cause to effect a warrantless arrest can be premised upon information furnished to the arresting officer by another. *Eldred v. Commonwealth,* Ky., 906 S.W.2d 694, 705 (1994), *cert. denied, Kentucky v. Eldred,* 516 U.S. 1154, 116 S.Ct. 1034, 134 L.E.2d 111 (1996); *Stanford v. Commonwealth,* Ky., 734 S.W.2d 781, 792 (1987), *aff'd, Stanford v.. Kentucky,* 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989); *Brewster v. Commonwealth,* Ky., 278 S.W.2d 63 (1955). Gerald Talbott's signed confession implicating Appellant in the murder of her daughter constituted sufficient probable cause for Harlow to arrest Appellant without a warrant.

■ Absent exigent circumstances, mere probable cause is insufficient to permit an arresting officer to enter the suspect's home without a warrant. *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). However, at the time of her arrest, Appellant was standing in the doorway of her home, a public place where she had no reasonable expectation of privacy. Thus, she was subject to a valid warrantless arrest. *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976).

## II. VALIDITY OF SEARCH

■ After placing Appellant under arrest and advising her of her *Miranda* rights, Harlow asked Appellant if she would sign a written consent to search her residence and vehicles. He also advised her that if it were necessary to obtain a search warrant, the

residence would have to be sealed off for several hours until the warrant could be obtained. Appellant implied at the suppression hearing that she signed the written consent to search because she wanted her mother, who was visiting from Nebraska, to have access to her residence. However, her primary argument on appeal is that a consent to search cannot be voluntary if given after the defendant is placed under arrest. In *Kennedy v. Commonwealth*, Ky., 544 S.W.2d 219 (1976), we held that a written consent to search is not involuntary merely because it is executed after the defendant is taken into custody, particularly if the defendant was given *Miranda* warnings prior to executing the form. *See also United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). Whether a consent to search was voluntarily given is a question of fact to be determined by a preponderance of the evidence from the totality of all the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047-48, 36 L.Ed.2d 854 (1973); *Cook v. Commonwealth*, Ky., 826 S.W.2d 329 (1992). The issue is a preliminary question to be decided by the trial judge, KRE 104(a), whose factual findings are conclusive if supported by substantial evidence. RCr 9.78; *Diehl v. Commonwealth*, Ky., 673 S.W.2d 711 (1984). Here, the trial judge found that the consent was voluntary and not the product of duress or coercion. Those findings were supported by substantial evidence, thus are conclusive of the issue.

## III. REQUESTS FOR COUNSEL

Appellant asserts that both of her written statements should have been suppressed, because they were obtained after she asserted her right to counsel. *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Baril v. Commonwealth*, Ky., 612 S.W.2d 739 (1981). Following a suppression hearing, the trial judge found that Appellant's requests for counsel were not sufficiently clear and unambiguous so that a reasonable officer under the same circumstances would have known that she was requesting the presence and advice of counsel. *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). The suppression

hearing consisted of the testimonies of Appellant, her mother, Dora Lea Sassman, and Detective Harlow. Their testimonies were less than consistent.

### 1. Testimony of Appellant.

Appellant testified that on three different occasions after her arrest and before she was transported to the Hart County jail, she asked Harlow if she could call attorney Vincent Yustas; and that Harlow replied (1) she could not make a call until she was "booked" and (2) Yustas had told Harlow that he was already representing Gerald Talbott in the case and could not represent Appellant because of the conflict of interest. Appellant also testified that after being told that Yustas could not represent her, she made two inquiries about a public defender and was told that she could not have a public defender until her first court appearance on Tuesday morning, March 21. She then testified that after being taken to the Hart County jail, but before she was "booked," she again asked if she could call Yustas, but if Yustas could not represent her, why could she not have a public defender? She claimed that she was again advised that a public defender could not be appointed until her first court appearance. Finally, Appellant testified that after she was "booked," Harlow told her that he would see her in court and that she probably would be appointed an attorney at that time.

### 2. Testimony of Dora Lea Sassman.

Appellant's mother testified that when she arrived at Appellant's residence, Harlow remarked, "I suggest you use that money she gave you to get her a good attorney," to which Mrs. Sassman replied, "She has a good attorney, Yustas." Appellant then advised that she had been trying to reach Yustas for four or five days and that he had not returned her calls. Harlow advised Appellant that she needed to get another attorney, because Yustas was already representing Gerald. Appellant then stated that she would need an attorney and that if Yustas could not represent her, "I need to get somebody who will." When Mrs. Sassman inquired about a "state appointed" attorney, Harlow advised that a public defender could not be appointed until Appellant's first court

appearance. Mrs. Sassman then told Appellant "not to say anything to them until you get an attorney."

### 3. Testimony of Detective Harlow.

■ Harlow testified that Appellant told him that she wanted to talk to Yustas, and that he advised her that Yustas had told him that he could not represent Appellant because he was representing Gerald and could not represent both. Harlow denied telling Appellant that she could not call an attorney. After Appellant was "booked," Harlow asked her if she would give him a statement and Appellant replied that she did not want to give a statement until she talked to a lawyer. However, after further conversation, she changed her mind and rendered the statement in which she claimed that Gerald killed Christina and that her only involvement had been to assist in disposing of the body.

It was not improper for Harlow to advise Appellant that Yustas had told him that he could not represent both Gerald and Appellant in this case. Yustas's interpretation of his position was clearly correct. Commonwealth v. Holder, Ky., 705 S.W.2d 907 (1986); Maynard v. Commonwealth, Ky., 507 S.W.2d 143 (1974). Appellant's complaint that she was denied the opportunity to call Yustas rings hollow in light of the fact that she had been trying without success to reach him for four or five days and that she made no attempt to call him even after she was "booked" at the Hart County jail. Nor do we discern any impropriety in Harlow's advice to Appellant that she would not be appointed a public defender until her first court appearance. Duckworth v. Eagan, 492 U.S. 195, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989). Although a public defender may be appointed at a preliminary stage of the proceedings, West v. Commonwealth, Ky., 887 S.W.2d 338 (1994), such appointment can only be made by a judge or trial commissioner and only upon at least a claim of indigency. KRS 31.110(1). The judges and the trial commissioner were all absent from the county, and Appellant does not assert that she ever told anyone on March 17 that she was indigent.

■ However, regardless of the import of the conversations which took place at Appel-

lant's residence on March 17, once Appellant advised Harlow that she did not want to make a statement until she talked to a lawyer, any further conversation concerning that subject was precluded and the March 17 statement should have been suppressed. Smith v. Illinois, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984); Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). But the fact that the March 17 statement was inadmissible does not ipso facto invalidate the March 18 statement. Oregon v. Elstad, 470 U.S. 298, 318, 105 S.Ct. 1285, 1298, 84 L.Ed.2d 222 (1985); Greenawalt v. Ricketts, 943 F.2d 1020, 1026–27 (9th Cir.1991). That is particularly true where, as here, Appellant made no claim that she was induced to make the March 18 statement because she already had partially incriminated herself in the March 17 statement.

■ Even after an accused expresses his or her desire to speak to an attorney, a statement subsequently obtained is not involuntary if the conversation was renewed at the initiation of the accused. Edwards v. Arizona, supra, 451 U.S. at 484–85, 101 S.Ct. at 1885. The word "initiation" is to be considered in the "ordinary dictionary sense of that word." Oregon v. Bradshaw, 462 U.S. 1039, 1045, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983). There was substantial evidence to support the trial judge's finding that Appellant initiated the March 18 conversation with Harlow, thereby voluntarily relinquishing her right to be free from further interrogation. KRE 104(a); RCr 9.78; Mitchell v. Commonwealth, Ky., 908 S.W.2d 100 (1995); Skinner v. Commonwealth, Ky., 864 S.W.2d 290 (1993). Since Appellant was readvised of her Miranda rights prior to rendering the March 18 statement, and since there is no evidence that the statement was the product of duress or coercion, any delay between her arrest and her first court appearance, see RCr 3.02, did not affect the admissibility of that statement. Savage v. Commonwealth, Ky., 939 S.W.2d 325 (1996).

■ Since Appellant's March 18 statement was clearly admissible, the admission of the March 17 statement was harmless error. RCr 9.24. The fact that an error involves a constitutional right does not preclude harm-

less error analysis. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The test is "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction," *Id.,* 386 U.S. at 23, 87 S.Ct. at 827, *quoting Fahy v. Connecticut,* 375 U.S. 85, 87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963), or, put otherwise, whether the error was harmless beyond a reasonable doubt. *Chapman v. California, supra,* 386 U.S. at 24, 87 S.Ct. at 828. In *Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972), the admission of a confession obtained in violation of *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) was held harmless, since it only contained information which was cumulative to that contained in three other admissible confessions. *Compare Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), in which the inadmissible first confession had been coerced; both confessions were verbal and were made to two different persons, and the person to whom the second, uncoerced confession was made, was of doubtful credibility; and, unlike here, the accused admitted in the inadmissible statement that he had committed the murder. A majority of the Court in *Fulminante* recognized that the admission of even a coerced confession could be harmless error under different circumstances; and the Court was unanimous in reaffirming *Milton v. Wainwright, supra,* that a confession deemed merely involuntary, because obtained in violation of the Sixth Amendment right to counsel, would be harmless error absent a showing of prejudice.

The only difference between Appellant's March 17 and March 18 statements was that she omitted from her March 17 statement any facts incriminating her in the actual murder of her daughter. There is no reasonable possibility that the admission of the March 17 statement in which Appellant *denied* killing her daughter might have contributed to her conviction; thus, as in *Milton v. Wainwright,* the error was harmless beyond a reasonable doubt.

## IV. EXTREME EMOTIONAL DISTURBANCE

Appellant asserts it was error not to instruct the jury on extreme emotional disturbance and the lesser included offense of first-degree manslaughter. As a corollary to this argument, she also claims it was error to exclude the opinion of her expert witness, Dr. Anna V. Wilson, that she was acting under the influence of extreme emotional disturbance when she participated in the killing of her daughter.

Since Appellant did not testify, her confession of March 18, 1995 provides the only factual basis for determining whether the jury might have a reasonable doubt whether she was acting under extreme emotional disturbance. *Cf. Bills v. Commonwealth,* Ky., 851 S.W.2d 466, 469 (1993). In *McClellan v. Commonwealth,* Ky., 715 S.W.2d 464 (1986), *cert. denied,* 479 U.S. 1057, 107 S.Ct. 935, 93 L.Ed.2d 986 (1987), we defined extreme emotional disturbance as follows:

Extreme emotional disturbance is a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes. It is not a mental disease in itself, and an enraged, inflamed, or disturbed emotional state does not constitute an extreme emotional disturbance unless there is a reasonable explanation or excuse therefor, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under circumstances as the defendant believed them to be.

*Id.* at 468.

Although Appellant made one reference in her confession to being "more hurt than mad" and another that "[m]ost of my anger was toward Sam (Christina)," the thrust of her confession was not that she was so enraged, inflamed or disturbed that she acted uncontrollably, but that she and her husband carefully planned, rehearsed and carried out the cold-blooded murder of her daughter, because they feared Gerald would be sent to prison if the authorities learned of

his sexual affair with Christina,[1] and because they felt that their relationship would be better if Christina were out of the way. Evidence of mere "hurt" or "anger" is insufficient to prove extreme emotional disturbance. *Thompson v. Commonwealth,* Ky., 862 S.W.2d 871 (1993).

To overcome this factual deficiency, Appellant proffered the testimony of Dr. Anna V. Wilson, a counseling psychologist specializing in battered women and women as offenders in the criminal justice system. On the basis of her interview of Appellant and her examination of the results of psychological tests performed by other mental health professionals, she testified that Appellant was raised in a dysfunctional family, that she lacked the ability to nurture her children, that she was emotionally dependent upon men, and that her relationship with her husband was "parasitic." However, the trial judge would not permit her to render her opinion that at the time Appellant planned and participated in the murder of her daughter, she was acting under the influence of extreme emotional disturbance.

Dr. Wilson's opinion was premised upon her conclusion that a person with Appellant's psychological profile would become emotionally disturbed upon learning that her daughter was having an affair with her husband. One might presume that any normal wife and mother would be emotionally disturbed by such information. However, "extreme emotional disturbance," as defined in *McClellan v. Commonwealth, supra,* and interpreted in such cases as *Stanford v. Commonwealth,* Ky., 793 S.W.2d 112 (1990), *Foster v. Commonwealth,* Ky., 827 S.W.2d 670 (1991), *cert. denied,* 506 U.S. 921, 113 S.Ct. 337, 121 L.Ed.2d 254 (1992), and *Whitaker v. Commonwealth,* Ky., 895 S.W.2d 953 (1995), has clearly become a phrase of art in our jurisprudence. Dr. Wilson never defined what she meant by extreme emotional disturbance. At one point in her avowal, she testified that Appellant's judgment was "impaired" (as opposed to "overcome") and at another that Appellant was unable to distinguish right

from wrong. Unless such testimony is directed to the concept of extreme emotional disturbance as defined by Kentucky law, an expert's opinion in this regard does not "assist the trier of fact to understand the evidence or to determine a fact in issue." KRE 702.

■ Furthermore, we have held that extreme emotional disturbance must be proven by some definitive, unspeculative evidence. *Morgan v. Commonwealth,* Ky., 878 S.W.2d 18, 20 (1994). Where the defendant does not testify and there is no other factual basis to support a defense of extreme emotional disturbance, that defense cannot be bootstrapped into the evidence by an expert opinion premised primarily on out-of-court information furnished by the defendant. For example, Dr. Wilson testified that Appellant came to view Christina as the "other woman" instead of her daughter. To permit this type of evidence would allow a defendant to testify by proxy without being subjected to the crucible of cross-examination.

The objection to Dr. Wilson's testimony was properly sustained and Appellant's request for jury instructions on extreme emotional disturbance and first-degree manslaughter was properly denied.

## V. EXCLUSION OF PHOTOGRAPH

■ The trial judge sustained the Commonwealth's objection to Appellant's attempt to introduce into evidence a life photograph of Gerald Talbott. The photograph depicts Gerald sitting behind the wheel of a vehicle, scowling, unshaven, and smoking a cigarette. When questioned concerning the relevance of this photograph, defense counsel responded only that it depicted Gerald as he looked at the time of the murder and that it would assist witnesses in their identification of him. The only witnesses who testified to having had personal contact with Gerald Talbott were Detective Harlow and Joey Wolf, Gerald's former cellmate at the Franklin County jail. Neither professed to need the assistance of a photograph to identify Gerald Tal-

---

1. Although Christina had reached the age of consent, KRS 510.020(3)(a), and forcible compulsion apparently was not involved, KRS 510.020(2)(a), sexual intercourse between stepparent and stepchild is incest, a class C felony. KRS 530.020.

bott. While we have permitted the introduction of life photographs of homicide victims to prove they were living persons rather than mere statistics, *e.g., Eldred v. Commonwealth, supra, McQueen v. Commonwealth,* Ky., 669 S.W.2d 519 (1984), *cert. denied,* 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984), we perceive no similar need for the introduction of a life photograph of the perpetrator of the homicide. Since the admission of this photograph was unnecessary to prove identity and its content had little or no probative value, the trial judge did not abuse his discretion in refusing its admission. KRE 401; KRE 403; *Clark v. Hauck Mfg. Co.,* Ky., 910 S.W.2d 247, 253 (1995); *Freeman v. Oliver M. Elam, Jr. Company,* Ky., 372 S.W.2d 796, 798 (1963).

### VI.  VIOLATION OF KRS 29A.310(2)

■ Appellant asserts it was reversible error for the trial judge to deny her motion for a mistrial after she discovered that Sheriff Jeff Staples, a witness for the Commonwealth, had engaged in conversations with three jurors during trial recesses. KRS 29A.310(2) provides as follows:

No officer, party, or witness to an action pending, or his attorney or attorneys shall, without leave of court, converse with the jury or any member thereof upon any subject after they have been sworn.

■ At a hearing in chambers on Appellant's motion, the following information was adduced concerning the violations: (1) Juror Lisa Rothman Puckett approached Sheriff Staples to report a drunken driver on the road and the sheriff responded that he would check out the report. (2) Juror Jerry Carter, an employee of Kentucky Utilities Company, mentioned the severe storm which had occurred the previous evening, and Sheriff Staples inquired whether any power lines were down. Carter responded that none were down. (3) Juror Jan Russell, a teacher at Hart Memorial School had previously worked with Sheriff Staples in the DARE program and wanted to know why that program was not being offered at her school. The trial judge found that none of these conversations had any relationship to the case on trial, thus the violation of KRS

29A.310(2) was harmless. We agree. A mistrial is not warranted if the conversation between the witness and the juror was "innocent" and matters of substance were not involved. *Jones v. Commonwealth,* Ky.App., 662 S.W.2d 483, 484 (1983); *see also Owings v. Webb's Ex'r,* 304 Ky. 748, 202 S.W.2d 410 (1947); *C.V. Hill & Co. v. Hadden's Grocery,* 299 Ky. 419, 185 S.W.2d 681 (1945); *Canter v. Commonwealth,* 176 Ky. 360, 195 S.W. 825 (1917). "The true test is whether the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." *Cf. Byrd v. Commonwealth,* Ky., 825 S.W.2d 272, 275 (1992).

### VII.  SUFFICIENCY OF THE EVIDENCE

■ Finally, Appellant asserts she was entitled to a directed verdict of acquittal because the Commonwealth failed to prove the element of intent necessary to convict her of complicity to murder. KRS 502.020(1); KRS 507.020(1)(a). It is elementary that intent may be inferred from the act itself or from the circumstances surrounding it. *Tungate v. Commonwealth,* Ky., 901 S.W.2d 41 (1995); *Smith v. Commonwealth,* Ky., 737 S.W.2d 683, 688 (1987); *Lambert v. Commonwealth,* Ky.App., 835 S.W.2d 299, 301 (1992). Appellant's confession of March 18, 1995, as corroborated by the location of the victim's body, the autopsy results, and the physical evidence obtained during the search of Appellant's residence, was sufficient to support her conviction of complicity to murder.

For these reasons, the judgment of conviction and the sentence imposed upon Appellant by the Hart Circuit Court are affirmed.

STEPHENS, C.J., and GRAVES, JOHNSTONE and WINTERSHEIMER, JJ., concur.

STUMBO, J., dissents by separate opinion, with LAMBERT, J., joining that dissent.

STUMBO, Justice, dissenting.

I must dissent because I believe both statements made by Appellant should have been suppressed, as both were given after Appellant had clearly and unequivocally in-

voked her right to counsel. In its most recent statement on the issue, the United States Supreme Court, in *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), discussed the need for specificity in the request for counsel by the person held in custody. After describing several alternative approaches, the Court held the request "must articulate [the suspect's] desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis,* 512 U.S. at 459, 114 S.Ct. at 2355, 129 L.Ed.2d at 371.

Here, Appellant asked not just for counsel in general, but for not one, but two different, specific attorneys by name. She made those requests at the scene of the arrest and after she was placed in the jail. Her requests were denied by the officers on the grounds that she had not been booked at the jail, that she had not yet been arraigned, and that one of the attorneys had a conflict of interest because he was already representing Appellant's husband in reference to the same crime. She was advised that the public defender could not be contacted until she appeared before a judge. Arrested on a Friday, she was told she could not be arraigned until court was back in session on the following Tuesday.

The majority opinion has held that the first statement made by Appellant on Friday, the day she was arrested, should have been suppressed, but that the failure to do so is not reversible error because the second statement was admissible. The second statement is admissible, the majority opinion concludes, because Appellant initiated the communication that led to the confession. What the majority opinion disregards is the circumstances in which Appellant found herself. She was being held in the local jail, had been told she had the right to counsel, had asserted that right repeatedly, and despite those assurances, was denied the ability to speak with counsel. She was faced with days of uncertainty in seeming isolation. The situation she was in was profoundly coercive and designed to intimidate her into waiving her right to counsel.

This Court has spoken clearly on this issue: "The failure to provide counsel when requested and the continued questioning of the accused is a serious deprivation of the rights of [a defendant]. We cannot countenance or approve of this failure. Once a defendant requests counsel all questioning must cease." *Baril v. Commonwealth,* Ky., 612 S.W.2d 739, 743 (1981) (citations omitted). Whether a request is sufficient to trigger the need to cease questioning was addressed by this Court in *Dean v. Commonwealth,* Ky., 844 S.W.2d 417 (1993), *cert. denied,* 512 U.S. 1234, 114 S.Ct. 2737, 129 L.Ed.2d 858 (1994), wherein we examined the significance of the statement of "Should, should I, should I have somebody here? I don't know," in response to the *Miranda* warnings. We concluded that a suspect's request for counsel must be "unambiguous and unequivocal" to trigger the need to cease questioning entirely until counsel is present. *Id.* at 420 (citing *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). How much more certain can a person be than to ask to speak with counsel whom she has specifically named? Although Yustas represented Appellant's husband and may well have had a conflict of interest, it was he, the attorney, who should have made that decision, not the police officer. As for the refusal to contact the public defender for Appellant, again it is not the role of the police officer to determine whether a particular attorney is able to represent a client, but rather, the decision should be left to counsel involved.

The facts of this case are horrendous. Appellant is not a sympathetic figure, having apparently chosen to support her husband to nightmarish lengths. However, the right to counsel is a sacred one, guaranteed in the strongest of terms by the United States Constitution, as well as by the Kentucky Constitution. Even the guiltiest of defendants possesses that right. This case should be reversed and remanded for a new trial at which both statements given by Appellant should be suppressed.

LAMBERT, J., joins this dissenting opinion.