**Toby Ray LASURE, Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2011–SC–000220–MR.

Supreme Court of Kentucky.

Oct. 25, 2012.

Rehearing Denied Feb. 21, 2013.

Erin Hoffman Yang, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, William Bryan Jones, Office of the Attorney General, Office of Criminal Appeals, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice CUNNINGHAM.

Appellant, Toby Ray Lasure, shot and killed Christopher Tolliver in the parking lot of the Lexington Green shopping cen-

ter on the afternoon of March 5, 2009. There were several eyewitnesses to the shooting. Brian Engle described hearing a gun shot, then seeing Tolliver on the ground on all fours. Lasure stood over the victim while holding a handgun, and then got in his vehicle and drove away. Another eyewitness testified that Lasure appeared angry and was yelling aggressively at Tolliver while pointing a gun at him. Lasure fired the weapon at the back of Tolliver's head, then stepped over the victim and drove away. Two other witnesses provided substantially similar accounts of the shooting.

Though emergency responders arrived within minutes, Tolliver died in an ambulance en route to the emergency room. Meanwhile, Lexington police officers were following Lasure's black vehicle. As the car sped out of the parking lot, it hit another vehicle and ran a red light. Travelling at estimated speeds of up to 80 mph, the vehicle weaved through traffic and ran other cars into the median. Eventually, Lasure pulled the vehicle into a parking lot at the Ridge Behavioral Systems. Surrounded by police, he refused to exit the vehicle and sat in the driver's seat screaming and pointing the gun at his head. From the vehicle, Lasure called Tony Devereaux, a counselor employed at the Ridge. At the time, Lasure and Devereaux were in a romantic and sexual relationship. After three hours, Devereaux and a Lexington police negotiator convinced Lasure to exit the vehicle peacefully.

The relationship between Lasure and Devereaux was rocky and marked by frequent breakups and fights. Devereaux testified that the relationship was "tumultuous," and that Lasure often asked him for mental health counseling. Devereaux declined to help Lasure, citing ethical concerns, but admitted to calling him "bipolar" and "borderline" during heated argu-

ments. Lasure, in his testimony and in statements to investigators and psychologists, described a more abusive relationship. He claimed that Devereaux was verbally abusive, condescending, and emotionally manipulative. He told investigators that, on at least one occasion, Devereaux had also physically abused him.

When Lasure met Tolliver, his relationship with Devereaux was "on-again." Devereaux insisted on meeting Tolliver himself. The three men met at the gym to work out together, but the encounter ended abruptly when Devereaux perceived that Tolliver was flirting with Lasure. Later, Lasure and Devereaux again split up and Lasure moved out of Devereaux's home. Thereafter, Lasure's relationship with Tolliver became romantic and the two began casually dating. According to Lasure's testimony, he eventually came to believe that Tolliver was using him for money. As his meetings with Tolliver became less frequent, Lasure began dating Devereaux again, even moving back into Devereaux's home.

Lasure's mental and emotional state deteriorated during February of 2009. On March 2, three days before the shooting, Lasure visited Dr. John Reesor, a family practice physician. Lasure complained of depression, frequent crying, mood changes, memory loss, panic attacks, and an inability to concentrate. Dr. Reesor prescribed an anti-anxiety medication and Chantix, a drug used for smoking cessation. Upon learning of the prescriptions, Devereaux opined to Lasure that he needed medication for depression, not anxiety. He directed Lasure to seek help at the Harris Institute, a clinic run by graduate students in psychology at the University of Kentucky.

Lasure called the Harris Institute on March 2 and complained of mood changes and trouble sleeping. An appointment

was made for March 5 with Marianne Edmundson, a doctoral student in clinical psychology. At that appointment, Lasure reported problems relating back to when he came out as a homosexual to his family and was rejected. He also told Edmundson that his relationship with Devereaux was emotionally, but not physically, abusive. Lasure described feelings of depression, racing thoughts, and an inability to concentrate. He described alternating periods of euphoria and extreme sadness. He denied, however, hearing any voices or having any thoughts of violence towards himself or others.

After leaving the Harris Institute, Lasure exchanged text messages with both Devereaux and Tolliver. He expressed feelings of hopelessness to Devereaux. Later, he began asking Tolliver to meet him. Tolliver repeatedly, and increasingly vehemently, declined to meet Lasure. Finally, however, Tolliver relented and told Lasure to meet him at the Lexington Green.

It is unclear exactly what transpired between Tolliver and Lasure immediately prior to the shooting. This is because Lasure's testimony at trial differed markedly from his own statements to investigators. Lasure's interview with police was played for the jury during the Commonwealth's case-in-chief. During that interview, Lasure told investigators that he and Tolliver sat in his car at the Lexington Green parking lot. Tolliver told Lasure that he didn't want to talk to him anymore and called Lasure an "asshole." Tolliver taunted Lasure with stories of other men he had met at the gym, which "destroyed" Lasure. According to Lasure, Tolliver's insults "set him off" and the shooting "just happened" as if "it wasn't me." Lasure also described hearing voices in his head the entire day which had directed him to take the gun to the shopping center.

At trial, however, Lasure testified that he brought the gun, a bottle of steroids, and cash to the shopping center because Tolliver asked him to. He admitted that he would hear voices as a child, but denied hearing any voices on the day of the shooting. While Tolliver was sitting in Lasure's car, Lasure received a phone call from Devereaux. According to Lasure, he had previously informed Tolliver of the abusive nature of the relationship he had with Devereaux. When Lasure admitted that he had moved back in with Devereaux, Tolliver became furious and expressed his frustration that Lasure would return to the unhealthy relationship. He further testified that Tolliver told him he was going to the Ridge to confront Devereaux. Lasure testified that he "loved Devereaux" and "had to protect him," so he shot Tolliver. No steroids were found in Lasure's vehicle or on Tolliver's person after the shooting.

At trial, the defense argued that Lasure was acting under an extreme emotional disturbance ("EED") at the time of the shooting. Dr. Peter Shilling testified for the defense. He examined Lasure and found that he had a normal neurological examination. However, Dr. Shilling diagnosed him with posttraumatic stress disorder ("PTSD") and poly-substance abuse. He testified that PTSD is marked by an inability to deal with stress and anxiety. He stated that a person with PTSD often "snaps" when confronted with stress or tension.

To rebut this evidence, the Commonwealth presented the testimony of Dr. Andrew Cooley, a Kentucky Correctional Psychiatric Center physician. He concurred that Lasure had a normal neurological examination, but testified that he did not suffer from PTSD.

The jury rejected Lasure's claim of EED and found him guilty of intentional

murder, first-degree fleeing or evading police, and leaving the scene of an accident. The trial court accepted the jury's recommendation and sentenced Lasure to life for the murder conviction, five years for the fleeing and evading conviction, and ninety days for the conviction of leaving the scene of an accident. Though the jury recommended that the sentences be run consecutively, the trial court imposed concurrent sentences in accordance with *Bedell v. Commonwealth*, 870 S.W.2d 779 (Ky.1993).

Lasure now appeals as a matter of right. Ky. Const. § 110(2)(b). He raises four issues for our review. Because it is determinative of the matter, we address only the first claim of error.

Lasure argues that his Fifth Amendment right against self-incrimination was violated by the trial court's ruling with respect to Dr. Shilling. Prior to trial, the Commonwealth moved to prevent Dr. Shilling from testifying. The basis of this motion was the Commonwealth's claim that Dr. Shilling's testimony would include inadmissible out-of-court statements made by Lasure regarding the alleged EED. The issue was passed until trial and revisited at the close of the Commonwealth's case. At that time, the trial court opined that Dr. Shilling could not testify unless Lasure did, because his testimony would include Lasure's hearsay statements regarding the EED. Defense counsel stated repeatedly on the record that Lasure did not wish to testify, but ultimately did so in order to offer Dr. Shilling's testimony.

In making the ruling that Lasure would have to testify before Dr. Shilling would be allowed to offer his expert opinion, the trial court relied on *Talbott v. Commonwealth*, 968 S.W.2d 76 (Ky.1998) and *Padgett v. Commonwealth*, 312 S.W.3d 336 (Ky.2010). In *Talbott*, the defendant offered the testimony of a counseling psychologist to support her claim that she was acting under an EED when she killed her daughter. The trial court allowed the psychologist to render an opinion on Talbott's mental condition based on her interview and evaluation of the defendant. However, the trial court did not permit the psychologist to opine whether Talbott was acting under an EED at the time of the murder.

In affirming the trial court's ruling, this Court identified two potential problems that arise when a mental health expert is called to render an opinion that a defendant was acting under an EED. First, any expert testimony regarding mental condition must be specifically tailored: "Unless such testimony is directed to the concept of extreme emotional disturbance as defined by Kentucky law, an expert's opinion in this regard does not 'assist the trier of fact to understand the evidence or determine a fact in issue.'" *Talbott*, 968 S.W.2d at 85 (quoting KRE 702).

Furthermore, the expert cannot be permitted to simply testify by proxy or to repeat the defendant's statements without cross-examination. "Where the defendant does not testify and there is no other factual basis to support a defense of extreme emotional disturbance, that defense cannot be bootstrapped into the evidence by the expert opinion premised primarily on out-of-court information furnished by the defendant." *Id.*

We applied these principles in *Padgett*, a case more procedurally analogous to the present matter. In *Padgett*, the trial court ruled that the defendant's expert could not offer an opinion as to whether he was acting under an EED at the time of the offense unless there was some evidence upon which to base this opinion other than the defendant's own out-of-court statements. Padgett chose to testify in order to present the expert's testimony, but com-

plained on appeal that he was compelled to do so in violation of his Fifth Amendment rights.

In *Padgett*, we agreed with the trial court that, prior to Padgett's testimony, there was no evidence presented to support a finding of EED. In fact, the evidence contradicted Padgett's statements regarding the EED. We held that "the record supports the trial court's conclusion that the expert opinion was based on Appellant's out-of-court statements, and not other evidence." 312 S.W.3d at 342. As the trial court had correctly assessed the expert's testimony, Padgett was not compelled to testify, but rather made a strategic decision regarding his defense.

Turning to the present matter, we believe that the trial court erred in ruling that Lasure's testimony was required in order to admit Dr. Shilling's testimony. The trial court properly reserved its ruling until mid-trial in order to assess the evidence presented. However, when the issue was revisited after the close of the Commonwealth's case-in chief, significant evidence of Lasure's alleged EED had been admitted. The most direct evidence was Lasure's recorded interview with detectives, offered by the Commonwealth through the testimony of Detective Todd Eddings.

Within the first minutes of this interview, Lasure explained that he was clinically depressed and had been hearing voices recently, prompting him to seek psychological counseling. He later elaborated that the voices directed him to take the gun with him that day.

Lasure explained to Detective Eddings the events leading up to the shooting. He described wanting to meet Tolliver, who declined and said that he was eating lunch at a Kroger supermarket. Lasure went to the Kroger and saw another man exiting Tolliver's vehicle. Lasure continued to phone Tolliver, who finally relented and agreed to meet Lasure. Once face-to-face, Lasure claims that Tolliver told him to "get out of his life" and called him various expletives. Tolliver also told Lasure that he was romantically involved with the man and taunted Lasure's sexuality, which Lasure claims "absolutely destroyed" him. As Tolliver turned to exit the vehicle, he said: "I'm through with you," and "you're useless and you're worthless." These words "set him off."

According to Lasure, the shooting then "just happened." He described a surreal feeling that he "wasn't in control." He told the detective that "I was there, but it wasn't really me." Lasure offered an analogy to the detective, explaining: "It was like I was here, but my mind was sitting in your chair." In addition to Lasure's statement to detectives, the Commonwealth also presented the testimony of Dr. Reesor and Edmundson. Both testified to Lasure's precarious mental state in the days leading up to the shooting, providing further evidence to support the alleged EED.

We recognize that Tolliver's rejection and taunts typically do not constitute adequate provocation to create an EED. *Talbott*, 968 S.W.2d at 85 ("mere hurt or anger" is insufficient to constitute a triggering event). However, a defense of EED requires the jury "to place themselves in the actor's position as he believed it to be at the time of the act." KRS 507.030, Commentary (1974). For this reason, evidence of a defendant's mental condition or illness at the time of the alleged EED is relevant. *See Fields v. Commonwealth*, 44 S.W.3d 355, 359 (Ky. 2001) ("[T]he mere presence of mental illness.... is entirely relevant to a subjective evaluation of the reasonableness of the defendant's response to the provocation.").

Accordingly, when the trial court made its ruling, significant evidence supporting a defense of EED had been presented. Therefore, the defense of EED would not have been "bootstrapped into the evidence" by the testimony of Dr. Shilling. Rather, Lasure was entitled to present evidence of his mental condition, including Dr. Shilling's diagnosis of PTSD and his expert opinion that persons suffering from PTSD react more explosively to stress or tension. "Mental illness may be considered by the jury in the reaction by a particular defendant when there is probative, tangible and independent evidence of initiating circumstances, such as provocation at the time of his act which is contended to arouse extreme emotional disturbance." *Wellman v. Commonwealth*, 694 S.W.2d 696, 697 (Ky.1985). *See also Sherroan v. Commonwealth*, 142 S.W.3d 7, 20–21 (Ky.2004) (discussing relevance of "psychological or personality-based character traits" when considering subjective reasonableness of defendant's claim of EED).

We believe that the error in this case would have been avoided had a more detailed discussion between counsel and the trial court occurred concerning the substance of Dr. Shilling's testimony. Dr. Shilling's testimony concerned his diagnosis of PTSD and his expert opinion as to the meaning of that diagnosis. He also generally testified how persons with PTSD react to tension or stress. He did not define EED for the jury, nor did he offer an opinion that Lasure was acting under an EED when he shot Tolliver. Moreover, defense counsel did not elicit from Dr. Shilling any of Lasure's out-of-court statements regarding the alleged EED. *Talbott* and *Padgett* should not be applied mechanically to require the defendant's testimony whenever a defense of EED is advanced and expert testimony is offered concerning mental condition. The ruling must be made in light of the particular factual circumstances of the case and should not be applied to exclude otherwise admissible expert testimony concerning the defendant's general mental condition at the time of the offense.

The trial court's ruling in this case was erroneous and compromised Lasure's Fifth Amendment rights. In order to advance his defense of EED and present the testimony of Dr. Shilling, Lasure chose to take the stand. In light of the trial court's ruling, this choice cannot be considered voluntary. *Cf. Padgett.*

We have noted that Lasure's testimony at trial was notably different from that given to the police. Without speculating on the outcome, it is not inconceivable that his "forced" testimony worked to his detriment. Without it, there is a possibility the result of the trial would have been more favorable. Therefore, we are unable to conclude beyond a reasonable doubt that this error did not ultimately affect the verdict. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (harmless error analysis for errors implicating constitutional rights).

For the foregoing reasons, the judgment of the Fayette Circuit Court is reversed.

MINTON, C.J.; ABRAMSON, NOBLE, SCOTT and VENTERS, JJ., concur. SCHRODER, J., not sitting.