**Norman GRAHAM, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2009–SC–000069–MR.

Supreme Court of Kentucky.

Aug. 26, 2010.

As Modified Sept. 10, 2010.

Fred Greene, Russellville, KY, Counsel for Appellant.

Jack Conway, Attorney General, Christian Kenneth Ray Miller, Assistant Attorney General, Office of Attorney General, Office of Criminal Appeals, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice NOBLE.

A Todd County jury convicted Appellant Norman Graham of murder and first-degree rape. He seeks reversal of his convictions on four grounds: the lack of a *Daubert* hearing on DNA evidence; juror misconduct; prosecutorial misconduct; and undue delay in his prosecution. Finding no error, this Court affirms the Todd Circuit Court.

## I. Background

The victim in this case, Kay Williams, was raped and murdered 30 years ago on June 30, 1980. In the months before the rape and murder, Appellant had begun an intimate relationship with Williams. He met her at the Tiny Town truck stop, where she waitressed. The pair started dating and she would stay most nights at Appellant's trailer.

Appellant spent the day before Williams's death with her. They woke up that morning in Appellant's trailer. According to Appellant, they had sexual relations before going to Williams's grandmother's house for lunch with her family. What occurred after this point is disputed.

Appellant testified they immediately returned to his trailer where Williams proceeded to take a nap. He maintained that he left the trailer while she napped and that he never saw her alive again.

On the other hand, Regina Alexander, Kay Williams's sister, testified that, after lunch at the grandmother's house, she and Williams both drove from their grandmother's house to their parents' house, where both she and Williams lived. She testified that once there, Williams informed her that Williams and Appellant were having problems and their relationship would probably soon end. According to Regina, Kay Williams then drove their

mother to the home of another sister, Judy Stokley, who happened to live next to Appellant's trailer. Stokley also testified that Williams dropped their mother off there and that it was the final time she saw Williams alive.

Appellant admitted that after he and Williams both returned to the trailer, he left again that evening to meet his ex-wife at the Red Carpet Inn. He further admitted that his ex-wife wore a strong perfume that day. The Commonwealth used that admission in closing argument as an explanation for a theorized fight breaking out between Appellant and Williams when he returned to the trailer, ultimately consummating in rape and murder. Appellant, however, denied having returned home that night.

The next day, June 30, after being alerted by Appellant, police found Williams naked and dead in Appellant's bed inside his trailer. Her hands and feet were bound together, her jumpsuit had been cut off, and she had been stabbed 25 times in the chest. Investigators also discovered sperm inside her vagina and on her jumpsuit. However, the examiner who performed the autopsy explained that, at the time, "no doctor in the world [could] tell you what male produced these sperm. We're not that scientific yet."

Soon thereafter, in 1981, the Commonwealth prosecuted Appellant for the murder, but the trial resulted in mistrial from a hung jury. Perhaps because of weaknesses in its case, particularly, the lack of physical evidence connecting Appellant to the crime, the Commonwealth chose not to retry Appellant at that time. Thus, the Commonwealth had the indictment dismissed without prejudice and the case was closed.

In 2003, the sperm found on Williams was reexamined using modern DNA testing. It turned out to match Appellant's

DNA to a statistical probability of 1 in 506 trillion. After excluding other suspects through DNA analysis, the Commonwealth sought to reindict Appellant, this time for both rape and murder. At the new trial in Todd Circuit Court, the Commonwealth presented the DNA evidence that the sperm found on Williams's person derived from Appellant. The jury convicted Appellant of both first-degree rape and murder. On December 30, 2008, the trial court entered a final judgment of conviction and, following the jury's recommendation, sentenced Appellant to 40 years on each count, to run concurrently.

Sometime after trial, Appellant became aware of circumstances giving rise to a possible claim of jury misconduct. He first raised this claim on March 3, 2009, in a motion for a new trial presented to the circuit court. After conducting an extensive evidentiary hearing on the alleged juror misconduct, the trial court denied the motion for a new trial on April 30. Appellant now contests this ruling, as well as the other issues discussed herein, as a matter of right. Ky. Const. § 110(2)(b).

## II. Analysis

Appellant contests his convictions on four grounds. He first cites the trial court's failure to conduct a *Daubert* hearing on the DNA analysis as grounds for reversal. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Second and third, Appellant claims juror and prosecutorial misconduct. Finally, Appellant urges that the nearly 28 year lapse between the crime and his conviction violates his due process protection against undue delay in prosecution.

### A. *Daubert* Hearing

Prior to trial, Appellant asked for a *Daubert* hearing to determine the validity of the DNA analysis. The Commonwealth countered that a *Daubert* hearing is unnecessary for DNA analysis and that the court should instead take judicial notice of its reliability. The court found that DNA analysis is indeed reliable and, therefore, declined to conduct a *Daubert* hearing.

■ The method used to analyze Appellant's DNA is called Polymerase Chain Reaction ("PCR") analysis. As this Court noted over ten years ago, "DNA analysis using the PCR method has ... been recognized as valid and scientifically reliable." *Fugate v. Commonwealth,* 993 S.W.2d 931, 936 (Ky.1999). "It is clear that the PCR method of DNA analysis has been subjected to extensive peer review." *Id.* Due to scholarly review and acceptance, the Court held in *Fugate* that in that trial and in future cases, "DNA comparison analysis using the ... PCR method [ ] is admissible without being the subject of a pretrial *Daubert* hearing." *Id.* at 937–38. Thus, the trial court properly declined a *Daubert* hearing, instead allowing Appellant to try to undermine the credibility of the DNA evidence at trial. *See id.* at 938. ("The opposing party could question the handling of the samples, the chain of custody, the accuracy of the procedures, the quality of training of the particular person or persons who conducted the actual tests and whatever other challenge could be made to the credibility of the evidence.").

In fact, Appellant's primary allegation of fault with the DNA evidence related not to the method of analyzing the DNA, but instead to the source of the DNA. Essentially, Appellant questioned the authenticity of the DNA alleged to have been found on Williams's body due to the length of time between the discovery of the body and trial. Of course, the opportunity for the Commonwealth to authenticate the DNA occurs not at a *Daubert* hearing, but at trial, where the chain of custody is

proven before the evidence is introduced. The Commonwealth was indeed able to authenticate the DNA at trial and it subsequently was appropriately admitted into evidence.

## B. Juror Misconduct

Evidence of possible juror misconduct only came to light through information provided by certain individuals after the entry of final judgment and after Appellant's initial notice of appeal. The issue was, therefore, not raised at trial, but instead for the first time in a motion for a new trial. When that motion was denied, Appellant filed a supplemental notice of appeal, addressing the juror misconduct issue to this Court.

█ The Commonwealth urges that this issue is not properly before the Court because the supplemental notice of appeal—raising the juror misconduct issue—was never consolidated with Appellant's initial appeal. The initial notice of appeal applied to the original judgment of conviction and sentence. The supplemental notice of appeal applied to the order denying a new trial due to newly discovered evidence. However, it would waste judicial resources for this Court to resolve these two matters separately. As the Commonwealth concedes, this Court has the power to join them *sua sponte* into a single appeal and hereby does so.

Turning to the merits of the juror misconduct issue, two types of problems arise, both concerning the juror Charles Nabb: (1) Nabb's relationship with the victim and her family and (2) Nabb's interactions with the family and another juror during trial.

### 1. Relationship with the Family

█ Prior to trial, counsel for both sides engaged in individual *voir dire* with Nabb, just as with other jurors. In that conversation, Nabb was asked whether he "kn[ew] the [victim's] family." Nabb simply responded, "No."

In the months after trial, Teddy Robertson contacted Appellant's counsel and disclosed information about Nabb's past relationship with the victim and her family, suggesting possible bias. Robertson is the only person to have come forward describing any such relationship. Robertson described at a post-trial hearing how he himself was very close with the victim's family and would spend significant amounts of time at their house. Robertson also claims to have worked for Nabb for approximately twenty years and that every other day, Nabb would pick him up from the victim's family's home. According to Robertson, when Nabb came by to pick Robertson up, he would frequently converse with the victim's mother, but Robertson never heard what they were talking about.

Robertson further testified that Nabb "may" have dated Kay Williams, but he failed to provide any substantial basis for this possibility. Robertson suggested that they may have dated because they knew each other, but when asked how they knew each other, he simply responded that everyone in their hometown of Guthrie knew one another. To that extent, Robertson further acknowledged that the relationship between Nabb and the victim and her family was not necessarily one of friendship, but more one of acquaintanceship.

Robertson's testimony is not without some bias itself. He admitted that his ex-wife, Lisa Potter, with whom he remains in contact, and Appellant are life-long friends and she has long professed his innocence. In fact, Robertson admitted that his decision to provide information about Nabb was directed by Potter.

Robertson's testimony was also called into question by its contradiction from others. Nabb himself died shortly after trial;

however, the Commonwealth questioned Donna Nabb, Charles Nabb's ex-wife, about the juror's relationship with the victim's family. She could not recall her ex-husband having had any relationship with the victim's family and firmly denied that either he or she knew the victim herself at all. Donna Nabb further stated that neither Robertson nor anyone else ever worked for her husband. Regina Alexander, Kay Williams's sister, also testified that neither she nor her mother ever had a social relationship with Charles Nabb.

Based on this post-trial testimony, Judge Harris made the following finding:

The Court finds that contrary to his answer given during individual voire dire examination, juror Charles Nabb had some degree of acquaintance with the family of Virginia Meriwether (the mother of victim Kay Williams) but that the relationship was casual and not close enough to be considered more than acquaintance, as opposed to friendship.

 " '[T]he trial judge is in the best position to determine the nature of alleged juror misconduct and the appropriate remedies for any demonstrated misconduct.' " *Ratliff v. Commonwealth,* 194 S.W.3d 258 (Ky.2006) (quoting *United States v. Sherrill,* 388 F.3d 535, 537 (6th Cir.2004)). A trial judge's factual findings are reviewed only for clear error. *Miller v. Eldridge,* 146 S.W.3d 909, 915 (Ky.2004). The trial court's determination that Nabb and Kay Williams's family were casual acquaintances, but not friends, was not clearly erroneous.

 The question then becomes whether Nabb's casual acquaintance with the family is grounds for a new trial. This Court has established a three-pronged test to determine whether a new trial should be granted in this type of situation. "First, a material question must have been asked. Second, the juror must have answered the question dishonestly. And finally, the truthful answer to the material question would have subjected the juror to being stricken for cause." *Taylor v. Commonwealth,* 175 S.W.3d 68, 74–75 (Ky.2005). Thus, if Nabb answered a material question untruthfully, where a truthful answer would have had led to him being struck for cause, a new trial must be granted.

As to the first prong, there is no doubt that the question asked of Nabb—"Do you know the family?"—was material. Whether Nabb knew the family members and, more importantly, had a substantial relationship with them, directly implicated his bias in the case. Any question implicating a juror's bias in such a manner must be considered material. *Cf. id.* at 75 ("A question about whether a potential juror believes she can consider the full range of penalties upon a conviction for murder is about as material as they come.").

Turning to the second prong, Nabb's response to the question was found to be false. According to Judge Harris, *"contrary* to his answer" that he did not know the family, "Nabb had some degree of acquaintance with the family." (Emphasis added.) This does not necessarily mean that Nabb was dishonest, however. A juror answering contrary to the truth does not inherently equate to dishonesty; the juror could simply be mistaken. In this case, it is possible that Nabb honestly believed that he did not "know" the family. To "know" someone can have many different meanings and to "know" someone in a small town such as Guthrie may mean something different than in a larger city.

This is not to say that Nabb was being forthright in *voir dire.* It is possible that Nabb was indeed trying to conceal his relationship with the family in order to hide any possible bias, but it is not this Court's role to make such a factual deter-

mination. It should be noted that any uncertainty as to Nabb's relationship with the family, or at least how Nabb described the relationship, could have been clarified by more specific and concrete questioning during *voir dire*, e.g., "Have you ever met the victim or her family?" or "Have you ever conversed with them?"

■ Even if Nabb's response were found to be dishonest, Appellant has failed to meet the third prong of the test by proving that a "truthful" response would have led to Nabb being struck for cause. As the trial court found, and as the testimony from the post-trial hearing supports, Nabb was merely a casual acquaintance with the family, not a friend. "[A] casual acquaintance [is] not the close relationship needed to imply bias on the part of the juror." *Sanders v. Commonwealth*, 89 S.W.3d 380, 388 (Ky.2002); *see also Hatten v. Quarterman*, 570 F.3d 595, 602 (5th Cir.2009) ("Texas law requires more than the existence of a casual acquaintance with the victim of a crime or the victim's family to make a prospective juror subject to challenge for cause. The result is no different under the federal due process standard."). This is particularly so when whatever relationship the juror was said to have had with the family was "remote in time" to the trial. *Marsillett v. State*, 495 N.E.2d 699, 707 (Ind.1986).

■ Absent any determination by the trial judge that the casual acquaintance led to any bias, a new trial should not be ordered. This Court has repeatedly held that being a distant relative to the victim does not inherently impute bias. *See Ward v. Commonwealth*, 695 S.W.2d 404, 407 (Ky.1985) (no reversal where one juror was ex-brother-in-law and another a distant cousin); *Cox v. Commonwealth*, 255 Ky. 391, 392, 74 S.W.2d 346, 347 (1934) (no reversal where "one juror is shown to be a second cousin of the wife of a brother of

the deceased, and his wife's uncle married a niece of the deceased"). "It is within the discretion of the trial judge to determine whether or not there is any chance of prejudice resulting from a remote blood relationship between a juror and a victim." *Commonwealth v. Carter*, 444 Pa. 405, 282 A.2d 375, 377 (1971). "Obviously, the same standard should be applied where the juror is only a casual acquaintance of a relative of the victim." *Id.* at 377–78. While the trial court did not explicitly rule that the relationship was too slight to impute bias, he implicitly did so by denying Appellant a new trial. *See Montoya v. Scott*, 65 F.3d 405, 419 n. 29 (5th Cir.1995) ("implicit finding of impartiality in [trial court's] denial of the petitioner's challenge for cause"). Based on the trial court's finding that Nabb and the family were merely casual acquaintances and that no actual bias stemmed from that familiarity, it was not required to strike Nabb for cause. Thus, a new trial is not mandated on these grounds.

### 2. Juror Interactions During Trial

Appellant also complains that Nabb's interactions with the victim's family and another juror during trial require the verdict to be set aside.

#### a. Interaction with Family

■ Teddy Robertson, Lisa Potter, and Caleb Stewart all testified post-trial that they witnessed Nabb interacting with the victim's family on breaks during the first day of trial. Potter was the only one of the three who could identify the family members; according to her, Nabb spoke with Regina Alexander, Judy Blick, Roxanne Murvine, and Amy Whitaker. None of the witnesses overheard anything that was said.

Regina Alexander, one of the family members alleged by Potter to have con-

versed with Nabb, testified to the contrary, denying having talked to any of the jurors. Sabrina Sawyers, Kay Williams's daughter, who was also at the trial, could not recall either herself or Regina talking to Nabb either.

As to these allegations, the trial court made the following findings:

> The Court finds that during the October 13–17, 2008 trial, both before and after he was sworn as a juror in the case, Charles Nabb had some conversation and contact with members of Kay Williams's family in the environs of the courthouse. However, there is no evidence that juror Nabb discussed the pending case with those family members.

These findings are consistent with the testimony at the post-conviction hearing and therefore are not clearly erroneous.

 Nabb's brief conversation and contact with family members was unquestionably inappropriate. Witnesses are barred by statute from "convers[ing] with the jury or any member thereof upon any subject after they have been sworn." KRS 29A.310(2).

The family members who were witnesses at trial and conversed with Nabb were in direct violation of the law. Nonetheless, "[a] mistrial is not warranted if the conversation between the witness and the juror was 'innocent' and matters of substance were not involved." *Talbott v. Commonwealth*, 968 S.W.2d 76, 86 (Ky. 1998); *Owings v. Webb's Ex'r*, 304 Ky. 748, 752, 202 S.W.2d 410 (1947). "The true test is whether the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." *Talbott*, 968 S.W.2d at 86 (citing *Byrd v. Commonwealth*, 825 S.W.2d 272, 275 (Ky.1992)).

In previous cases concerning conversations between jurors and witnesses, Kentucky courts have been able to draw a bright line between conversations about the case and conversations about unrelated matters. The former prejudice the defendant, whereas the latter are harmless. *Compare Doyle v. Marymount Hospital*, 762 S.W.2d 813 (Ky.App.1988), *with Talbott*, 968 S.W.2d at 86, *and Jones v. Commonwealth*, 662 S.W.2d 483, 484 (Ky.App. 1983). But what happens when no one testifies to what the conversation was about? There is no way to determine or even to conjecture about the effect of the error, particularly, whether it was prejudicial or not.

 Kentucky's harmless error rule provides as follows:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order, or in anything done or omitted by the court or by any of the parties, is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order unless it appears to the court that the denial of such relief would be inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties.

RCr 9.24. The list of errors subject to the rule are evidentiary errors, ruling errors, errors by the court, and errors committed by one of the parties. RCr 9.24. Notably absent from this list is error committed by a juror or witness, as occurred here. Nonetheless, without any other guidance or a binding rule on how such "juror errors" or "witness errors" should be treated, this Court will utilize the same rule provided for most other errors. It makes particular sense that an error in something done by a witness should be subject to the same harmlessness test as an error com-

mitted by a party. For a juror to converse with a witness cannot be any worse than conversing with a party; such an error committed by a witness is at least as likely to be harmless.

▮ The rule generally states that an error is not ground for a new trial *"unless* it appears to the court that the denial of such relief would be inconsistent with substantial justice." *Id.* (emphasis added). To order a new trial, the court must affirmatively find substantial injustice apparent. The default approach of the rule is against reversal, thus placing the burden on the party—in this case, Appellant—claiming the error. Absent such a showing, a reviewing court has no reason, other than raw speculation, to think that error had a "substantial influence" on the judgment; nor is it likely that the court would be "left in grave doubt" about such influence. The lower court did not find the conversation to have caused substantial injustice to Appellant, nor should it have. Without any record of the brief conversation between Nabb and the family members, Appellant cannot meet his burden.

### b. Interaction with another Juror

▮ The only testimony regarding Nabb's conversation with another juror comes from Calvin Jones. Jones testified that during the final day of trial, he observed Nabb conversing with another juror during a break. At the post-trial hearing, he reported the following dialogue between the jurors:

> Nabb: They haven't shown me anything yet new to convince me.
>
> Juror: They haven't shown me anything either.

From this observation, Jones reasonably inferred the jurors were talking about the case and would rule in Appellant's favor. No one has confirmed or contradicted Calvin Jones' observation. The trial court therefore found that Nabb might have in fact been talking to the juror about the case, but even if he was, there was no indication of prejudice against Appellant by either juror.

Jurors are admonished not to discuss an ongoing case with one another (or anyone else). KRS § 29A.310(1). However, even if the jurors violated that admonishment in this instance, their discussion was harmless. If anything, the conversation indicated the jurors were leaning Appellant's way. The jurors both declared that they had not been convinced, and the party bearing the burden to "convince" was, of course, the Commonwealth. Moreover, Jones, after hearing the conversation, was left with the impression that Appellant would be acquitted. Thus, this Court agrees with the trial court that the conversation was not prejudicial to Appellant.

### C. Prosecutorial Misconduct

▮ In closing argument, the Commonwealth articulated its theory of the rape and murder. The theory was that when Appellant returned home at night, he smelled of perfume from having spent time with his ex-wife, thus triggering a fight between himself and Williams. As Williams had already suggested to her sister that she was considering ending the relationship, this was likely a natural point to do so. The Commonwealth argued that she did just that, thus enraging Appellant. Appellant then bound Williams's legs together, raped her, leaving his semen, and finally murdered her.

Appellant argues that there was no evidence of this dispute occurring and, therefore, it was misconduct for the prosecutor to describe it in closing argument.

▮ We disagree that there was any misconduct in the prosecution's closing ar-

gument. "This Court has repeatedly held that a prosecutor is permitted wide latitude during closing arguments and is entitled to draw reasonable inferences from the evidence." *Commonwealth v. Mitchell*, 165 S.W.3d 129, 132 (Ky.2005). It is a reasonable inference to conclude that Williams would have been upset at Appellant smelling of his ex-wife's perfume. While Appellant denies having returned home that night at all, his semen found on Williams, among other things, creates a possible inference that he did. It was reasonable for the Commonwealth to further argue that this could have resulted in a fight between Williams and Appellant about their relationship, where Appellant ultimately became enraged and raped and killed Williams.

■ Appellant's contention that these are not reasonable inferences relies on the false assumption that a reasonable inference can only derive from direct evidence. Because no one testified that a fight between Appellant and Williams actually took place, Appellant argues that the Commonwealth should not have described such a fight in closing. However, just as a jury is free to convict a defendant on circumstantial evidence alone, the prosecution may draw reasonable inferences from circumstantial evidence alone. *See Hodges v. Commonwealth*, 473 S.W.2d 811, 812 (Ky. 1971) ("It is well settled that a conviction may be had upon circumstantial evidence."). In this case, there was ample circumstantial evidence for the Commonwealth to draw an inference of a fight between Williams and Appellant: that Williams had earlier suggested the relationship was coming to an end; that Appellant left Williams that night to spend time with his ex-wife; that his ex-wife was wearing strong perfume; that Appellant was the first one to "find" Williams dead; and that Williams's legs had been bound

and Appellant's semen found on her, a circumstance indicating rape. Thus, there was no prosecutorial misconduct in the Commonwealth's description in closing argument of the fight leading up to the rape and murder.

### D. Undue Delay

■ The rape and murder of Kay Williams took place in 1980. Appellant was first tried for the murder in 1981, but after a mistrial due to a hung jury, the charges were dismissed without prejudice. It was not until 2007 that Appellant was re-charged—this time for rape and murder. Appellant argues that the 26 year gap between the mistrial and reinstating the charges constitutes undue delay.

■ It is first worth noting that any alleged undue delay in this case does not implicate Appellant's right to a speedy trial. "Once charges are dismissed, the speedy trial guarantee is no longer applicable because with no charges outstanding, personal liberty is certainly not impaired to the same degree as it is after arrest while charges are pending." *Kirk v. Commonwealth*, 6 S.W.3d 823, 826 (Ky.1999). "Nevertheless, unjustified and prejudicial preindictment delay may constitute a violation of due process and require dismissal." *Id.* However, "[p]rejudice alone will not suffice," *id.*; rather, "dismissal is required only where there is both substantial prejudice and an intentional delay to gain tactical advantage." *Id.*

Whether or not Appellant was prejudiced by this delay in prosecution, it was justified and, therefore, did not violate due process. Retrial, after the long delay, was very much justified in this case by the advance in science—namely, DNA analysis—since the time of the crime and first trial. The Commonwealth did not re-charge after the first trial because it had no new evidence. Thus, it was quite possi-

ble that a second trial would share the same outcome as the first—a hung jury. Only when DNA analysis was later developed, and eventually performed on the semen found in this case, did the Commonwealth obtain the evidence it needed to justify trying the case again. This evidence not only confirmed that Appellant had had sexual relations with the victim, but also demonstrated that no other person's semen was found on the victim after the rape.

Such delay is not a violation of due process. On the contrary, it is a commendable exercise in restraint by the prosecution to wait for sufficient evidence to re-charge. "Penalizing prosecutors who defer action for these reasons would subordinate the goal of 'orderly expedition' to that of 'mere speed.'" *United States v. Lovasco*, 431 U.S. 783, 795, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *see also id.* ("Rather than deviating from elementary standards of 'fair play and decency,' a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt."). Though no published opinion in Kentucky has addressed developments in DNA analysis as a justification for delaying indictment, in *Walker v. Commonwealth*, No. 2006–SC–000480–MR, 2007 WL 2404508 (Ky. Aug.23, 2007) (unpublished opinion), this Court established that such developments are in fact a legitimate justification.

■ While Appellant is correct that obtaining a tactical advantage is not a justification for delaying prosecution, *Kirk*, 6 S.W.3d at 826, that is not what occurred in this case. New evidence is not a tactical advantage. In *Lovasco*, the U.S. Supreme Court held that "investigative delay is fundamentally unlike delay undertaken by the Government solely 'to gain tactical advantage over the accused....'" 431 U.S. at 795, 97 S.Ct. 2044. The reason for this distinction is that "investigative delay is not so one-sided"—both sides have an opportunity to investigate. *Id.* While the wait for scientific advancement is not exactly investigative delay—or is at least a much more passive form of it—it is equally distinguishable from delaying for a tactical advantage. Just as with investigative delay, scientific advancement is not one-sided. The new DNA evidence could just as easily have helped a suspect as have hurt him. If the particular subject of DNA testing in this case—the sperm found on the victim—had belonged to someone other than Appellant, there would likely have been no further prosecution.

■ Appellant also casts his constitutional critique of the second trial as a double jeopardy concern. However, as even Appellant admits, it is well-recognized that a mistrial by way of hung jury does not bar re-prosecution. *Nichols v. Commonwealth*, 657 S.W.2d 932, 933 (Ky. 1983). "The granting of a mistrial because the jury is unable to agree is a classic example of when a retrial can be had...." *Id.* Thus, there are no double jeopardy concerns.

### III. Conclusion

For the aforementioned reasons, Appellant's convictions in Todd Circuit Court are affirmed.

All sitting. All concur.