RENDERED: NOVEMBER 22, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0955-MR

VONTELLA COMBS,
INDIVIDUALLY, AND AS
ADMINISTRATRIX OF THE ESTATE
OF BRYCE KOLTON WADE COMBS                                    APPELLANT

|  |  |
|---|---|
| v. | APPEAL FROM ROWAN CIRCUIT COURT<br>HONORABLE ELIZABETH DAVIS,[1] JUDGE<br>ACTION NO. 19-CI-90125 |

HOUSING AUTHORITY OF
MOREHEAD, AND CITY OF
MOREHEAD, KENTUCKY                                            APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: EASTON, GOODWINE, AND TAYLOR, JUDGES.

EASTON, JUDGE: Appellant ("Combs") tragically suffered the death of her nine-

year-old son ("Bryce") when he was swept away by rushing rainwater down a

---

[1] Judge Davis was elected to the circuit bench in the November 2023 election. The Honorable William Lane was the circuit court judge who presided over the trial in this action in February 2023.

concrete drainage flume.[2]  A jury found that Bryce's death was not caused by negligence by the Appellees.  Combs appeals the resulting judgment of the Rowan Circuit Court.  After a careful and thorough review, we affirm.

**FACTUAL AND PROCEDURAL HISTORY**

On Sunday, September 9, 2018, the city of Morehead, Kentucky experienced heavy rainfall.  Combs and Bryce had recently moved into Rawcel Heights subdivision, a neighborhood of the Housing Authority of Morehead ("Housing Authority").  On the day in question, Combs, Bryce, and a friend of Combs, Betty Whitaker ("Whitaker"), were unpacking personal belongings.  On this Sunday afternoon, Bryce went outside to play with a neighbor.  While it had been raining heavily earlier in the day, the rain had slowed.

Combs watched Bryce walk his bicycle over to the neighbor's home and knock on the door.  She then went back inside to continue unpacking.  Approximately fifteen minutes later, she looked outside and saw Bryce was still on the neighbor's front porch, with his friend J.L.  About twenty minutes later, the boys came to Combs' apartment and asked for some towels.  They were jumping in puddles.  The rain had increased, and the boys were wet.  Combs gave the boys

---

[2] Our analysis requires consideration of a surface water drainage system composed in part of pipes and a concrete flume.  A flume, as the term is used here, creates an inclined surface channel for water flow.

-2-

towels, and they went back outside to play in the rain. Combs again went back to unpacking.

A short time later, J.L. came running into Combs' apartment. J.L. yelled "Bryce is gone!" J.L. led Combs to the concrete flume that ran along the Housing Authority's property line. Combs went down to the creek to look for Bryce. Whitaker drove down to the creek to locate Bryce. He was nowhere to be found. Seven days later, Bryce's body was found about one and one-half miles away, on the banks of Triplett Creek.

Combs filed a Complaint against the City of Morehead ("City") and the Housing Authority on September 6, 2019, claiming wrongful death and specifically alleging the water drainage system was an attractive nuisance. Combs claimed the City and the Housing Authority had a duty to construct, maintain, and repair the storm drain system so that it would be reasonably safe and that they failed to do so. Combs further claimed the Housing Authority had a duty to warn of an unreasonably dangerous condition on its property. Combs believed the City and the Housing Authority should have known the flume would be attractive to children and that children had unhindered access to it.

A jury trial commenced on February 6, 2023. Over several days, the parties presented evidence. Because of the questions raised by Combs about the

propriety of the jury verdict based on that evidence, we will summarize the evidence in some detail.

The Rawcel Heights subdivision was constructed in the early 1960s. Along the property line of Rawcel Heights runs a concrete flume that is approximately 172 feet long. The flume is approximately six and one-half feet wide and about seven and one-half inches deep. This flume runs downhill and empties into Town Branch Creek. Underneath the flume, there is a 22-inch clay pipe that runs underground. This pipe runs the length of the flume and attaches to a catch basin at the top of the flume.

The flume was constructed by the Housing Authority in 1966, at the request of the United States Department of Housing and Urban Development ("HUD"). The purpose of the flume was to decrease erosion that was occurring on the Housing Authority property. It is unknown if the underground pipe was installed at the same time as the flume, and it is also unknown who installed the pipe.

Just over 200 feet above the catch basin, there is a 30-inch pipe that drains water from Rawcel Street and discharges at a headwall. This 30-inch pipe directs water into the catch basin and the concrete flume. While the catch basin is outside of a chain link fence marking a boundary line that runs the length of the

Housing Authority property, there is no fence or other obstacle blocking the concrete flume from a grassy area of the Housing Authority.

On the other side of the concrete flume and chain link fence is a wooden privacy fence that is on the property of 540 Crestview Lane. On September 9, 2018, Cindy Roland ("Roland") resided in the home at that address. Roland remembered the storm and heavy rainfall that day. She also remembered looking out her window and seeing children's heads popping up and down by the fence. This caused her concern, as she knew that if there were children that close to the fence, they had to be playing in the flume. She could hear the water rushing in the flume and in the creek, and she could also hear children playing and giggling. Roland stated she went outside with the intention of telling the children to get out of the flume because it was dangerous. As she was walking outside, she called 911.

Before Roland got to the fence, a boy approached her and asked if she had seen someone go down the creek. She asked this child if someone had fallen in, and he responded in the affirmative. Roland then informed the 911 operator what had happened.

The executive director of the Housing Authority testified that they do general maintenance on and around the concrete flume. They clear the weeds along the fence line, keep the flume free of debris, and occasionally clear the catch

basin and the entrance to the flume of gravel and other debris. There is no regular maintenance schedule. The maintenance team just does this when they notice it is needed.

The director stated they have regular inspections by HUD, and the flume has never been cited as an issue in any inspection. No one has ever recommended that a fence be built around the flume. The director testified that, while he has seen children playing in the yard around the Housing Authority, he has never seen a child play in the flume. Most of the time he sees children playing near the playground or the concrete lot, where there is a basketball goal, which he estimates to be about fifty yards from the flume. He is not aware of any injuries or issues that have occurred with the flume in the approximately sixty years it has been there.

The maintenance supervisor for the Housing Authority also testified. He has only been the supervisor since 2020 but has worked with maintenance since 2016. He confirmed that HUD has never made any recommendations regarding the flume. He stated that HUD is very thorough in their inspections, and that they walk around the entire property. He sometimes accompanies the HUD inspector during the inspections. He also stated that the Housing Authority hires a private consultant to do an inspection prior to the HUD inspections. This consultant has

also never mentioned any dangers or issues with the flume. He has never had any tenant complaints about the flume.

Another Housing Authority maintenance worker testified. He has worked for the Housing Authority since 2014. He explained that, under the previous supervisor, they would occasionally clear out the top of the catch basin when it was clogged, especially when they knew a big storm was expected. He stated, however, that this has not been done in quite some time. It was not cleared out before the storm that occurred during the weekend of September 9, 2018.

The testimony of all three of these witnesses was consistent in that they rarely saw the flume and the nearby creeks as full of water as they did during this weekend.

Several employees of the City testified. The testimony was generally that there was no set maintenance schedule for any of the storm drains. When they noticed pooling or some other issue, it was addressed then. They do not believe the catch basin, flume, or pipe running under the flume is the responsibility of the City, as it was entirely on Housing Authority property. Their testimony was also consistent in that no one seemed to know when the catch basin and the underground pipe were installed, or who installed them. No documentation could be located that would answer those questions.

Combs called William Brewer ("Brewer"), a licensed professional civil engineer, as her expert witness. Brewer testified that having the larger 30-inch pipe empty into the smaller 22-inch pipe is not a standard engineering design. He stated this would obviously lead to water overflowing into the flume, as the smaller pipe is unable to handle the volume of water coming from the larger pipe. He also stated it was unreasonably dangerous to not have some sort of obstacle at the bottom of the flume to prevent someone from falling into the creek if they were to be swept down the flume. Brewer stated the cross-current of the flowing water from the flume meeting the rushing water of the creek created a very dangerous drowning risk because if someone fell into that cross-current, they would be unable to get out of it. He highlighted the strong force of moving water, and estimated the force of the water flowing the day of the storm was equivalent to being caught in a tornado.

Brewer believed there are several relatively easy and cost-effective ways to minimize the risk of drowning. Some sort of barrier or fence could be installed at the end of the flume in order to stop someone from being swept into the creek, even if they were swept down the flume. A fence or some other obstruction that would block people from getting to the flume at all would be another option. It was Brewer's conclusion that the failure of those responsible for the flume to maintain it in a reasonably safe manner was a proximate cause of Bryce's death.

The Housing Authority called Eric Dawalt ("Dawalt") as their engineering expert. While he agreed with Brewer that the 30-inch pipe draining into the smaller 22-inch pipe was "unusual," he did not agree that this violated any applicable standards, as the City of Morehead had not adopted any type of standards in the 1960s when the Housing Authority and the flume were constructed. He also testified that just about any storm water system would have been overwhelmed by the amount of water that accumulated over the weekend of September 9, 2018. Dawalt stated that the amount of rainfall that occurred on September 9 alone according to the National Weather Service would qualify it as a 50-100 year storm event. The two-day rainfall total for that weekend would qualify it as a 200-500 year storm event. Dawalt testified that the system in question would have been able to handle a 10-year storm event, but very few systems would be able to handle a storm of the magnitude that occurred during this September weekend.

Dawalt did not disagree with Brewer that having a fence or bushes along the flume would be a good idea as a safety measure. He did not agree that there were any laws or standards that required such a practice.

The City presented a portion of the deposition testimony of Thresea Adkins ("Adkins"). Combs lived with Adkins for a period of time, and Adkins stated Combs spoke of Bryce often. On one occasion, Adkins claims Combs told

her she felt guilty over Bryce's death. When Adkins inquired as to why Combs would feel guilt over an accident, Combs confided to Adkins that she was in her apartment smoking marijuana when Bryce was swept away.

Finally, both sides presented expert economic testimony outlining their opinions as to Bryce's lost earning capacity. While both experts used substantially similar methodologies, their figures differed significantly. Combs' expert cited a much higher lost earning capacity than the City's expert.

The trial concluded on February 14, 2023. The jury returned a verdict in favor of the City and Housing Authority. Interrogatory 3 asked the jury "do you believe from the evidence that the Defendant, City of Morehead, failed to comply with its duty as set forth in Instruction No. 3 and that such a failure by the City of Morehead was a substantial factor in causing Bryce Combs' death?" The jury answered "No." By answer to other interrogatories, the jury also determined that the City did not fail to anticipate the presence of children on the concrete flume, that it did not fail to foresee that children might play in the water-filled concrete flume, that it did not fail to realize that the conditions around the concrete flume created by heavy rains were such that children would be endangered by stepping in it, and that the City did not fail to foresee that children would not appreciate the danger of the water-filled concrete flume.

The same questions were asked of the jury about the Housing Authority, and the jury again answered "No" to all. The jury also determined the Housing Authority did not know or should have known about a dangerous condition in its common area. It further found that the failure of the Housing Authority to warn about the danger posed by the concrete flume portion of the storm sewer was not a substantial factor in causing Bryce's death.

The jury did find pursuant to Instructions and Interrogatories 7 and 8, that Bryce failed to exercise ordinary care for his own safety and that Combs failed to exercise ordinary care for the safety and protection of Bryce, and that these failures were substantial factors in causing his death. The jury attributed 90% of the fault to Combs, and 10% of the fault to Bryce.

Combs filed a motion for a new trial. In her motion, Combs alleged jury misconduct. She attached to her motion the Affidavit of Betty Whitaker, who alleged she overhead several of the jurors discussing the trial. Whitaker alleges that on the second day of trial, she heard one juror make the statement, "we shouldn't have to sit through three more days this, because I already have my mind made up." Whitaker indicated another juror nodded to this statement. She then alleged a third juror stated that she did not understand "why a lawsuit had even been filed against the City and Housing Authority for a child falling in a storm sewer, because the child's mother is to blame for not watching him." Whitaker did

not report these statements to anyone until March, and Combs' counsel was not made aware of these statements until April, approximately two months after the trial concluded.

Whitaker was unable to identify the jurors by name, but she did identify them by physical and clothing descriptions. The circuit court was able to identify which jurors Whitaker referenced. The jury foreperson is the individual alleged to have made the statement "the child's mother is to blame." This foreperson filed her own affidavit, denying having made any such statement. In addition to the juror misconduct allegation, Combs also moved for a new trial on the basis of the verdict not being supported by sufficient evidence.

On July 14, 2023, the circuit court held a hearing. Neither Whitaker nor any of the other jurors were called to testify. The circuit court determined there was not sufficient evidence to set aside the unanimous verdict of the jury. It also found there was sufficient evidence to support the jury's verdict, and it therefore denied Combs' motion for a new trial. This appeal followed.

## ANALYSIS

Combs argues the circuit court made multiple errors. First, she claims the jury's verdict in favor of Appellees was not supported by substantial evidence and that the circuit court should have granted her motion for a new trial on that basis. She further argues she was entitled to a new trial based on juror misconduct.

As for more specific errors, Combs alleges the circuit court allowed inadmissible character evidence to be presented to the jury. She also claims the circuit court erred by allowing one specific deposition to be played at trial, while not allowing another deposition to be played for the jury. Finally, she claims there were two reversible errors in the jury instructions. First, there should not have been instructions on an act of God, and second, Bryce's comparative fault should not have been presented to the jury. We will address these errors individually but a bit out of order.

## I. Character Evidence

Combs argues the circuit court allowed inadmissible character evidence to be presented to the jury in violation of KRE[3] 404(b). We review a circuit court's decision to admit evidence under an abuse of discretion standard. *Clark v. Commonwealth*, 223 S.W.3d 90, 95 (Ky. 2007). "And for a trial court's decision to be an abuse of discretion, we must find that the decision 'was arbitrary, unreasonable, unfair, or unsupported by sound legal principles.'" *Id.*

KRE 404(b) reads:

Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:

---

[3] Kentucky Rules of Evidence.

(1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or

(2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

KRE 401 defines "relevant evidence" as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Evidence which is not relevant is not admissible. KRE 402. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury . . . ." KRE 403.

Combs first alleges the circuit court erred by allowing the jury to hear about a DUI[4] that occurred in 2016. On this occasion, Combs was pulled over under suspicion of driving under the influence while Bryce was in the vehicle. This led to Bryce's removal from Combs' custody, and he spent six months in foster care. Combs ultimately pled guilty to the DUI. Because Bryce was in foster care, this led to testimony regarding Combs' required case plan and the tasks required of her before she could regain custody of Bryce. Combs argues this

---

[4] Operating a motor vehicle under the influence of alcohol or drugs, Kentucky Revised Statutes ("KRS") 189A.010.

-14-

testimony was simply presented to attack her character. The City and Authority argue it is relevant to Combs' loss of consortium claim.

Combs was also asked about Bryce's school records, some of which indicated he was often tardy or absent, and that his test scores were below average. Again, Combs argues this was presented to prejudice her case, while the City and Authority argue it is relevant to determine Bryce's future earning ability.

As for Bryce's short tenure in foster care and the reason behind it, there is little precedent to guide our analysis. We conclude that evidence surrounding a parent-child relationship is relevant and admissible in a wrongful death action where loss of consortium is claimed. For example, the existence of the two statutes that encompass "Mandy Jo's Law" (KRS 411.137 and KRS 391.033) indicate "[t]he Legislature's overarching intent in passing Mandy Jo's Law is not difficult to discern. It believed, as a matter of public policy, that parents who forego participation in their child's upbringing should be prevented from enriching themselves in the event that the child predeceases them." *Miller v. Bunch*, 657 S.W.3d 890, 895 (Ky. 2022). While we do not mean to infer that Combs had abandoned Bryce, these statutes would indicate that the type of evidence Combs sought to exclude had some relevance in determining the nature of her relationship with Bryce when assessing damages for loss of consortium.

Additionally, the Kentucky Supreme Court has stated "that as a practical matter the amount which the trial court may determine as compensation for an illegitimate father for the loss of affection or companionship could well be nothing or very nominal depending on the proof of the amount of affection and companionship, if any, the illegitimate father enjoyed during the life of the child." *Cummins v. Cox*, 799 S.W.2d 5, 7 (Ky. 1990). This again indicates that the quality of the parent-child relationship is relevant, and a child's time in foster care, even if brief and not close in time to the child's death, is a relevant consideration for the jury.

But relevance is overcome if there is danger of undue prejudice. The presentation of the DUI nature of the offense leading to the foster care placement in the context of the issue of loss of consortium claim alone is perhaps questionable. But the earning capacity of parents may be relevant in assessing the capacity of their child. Any criminal record, including a DUI record, could impact that capacity.

If the DUI itself was not admitted, it still led to Bryce being removed from Combs' custody and placed in foster care, which was relevant and admissible. Had the circuit court excluded the DUI, the jury may have speculated as to why Bryce was in foster care, which very well may have been more prejudicial to Combs. In this instance, Combs was allowed to explain the

circumstances surrounding the DUI, and that she successfully completed her case plan and had custody of Bryce returned to her in six months.

Another judge may have seen too great a risk of undue prejudice from the DUI-related evidence. But we review decisions, not redecide them. We discern no abuse of discretion or at most a harmless error in the overall circumstances of the case.

Combs also argues the City's economic expert improperly used Bryce's test scores and time in foster care to undervalue his lost earning capacity. While this expert did testify as to what he determined to be earning capacity at the twenty-fifth percentile of people, he also gave estimates of the average worker's earning potential at both the level of a high school graduate and for an individual who had earned an associate's degree. This expert also stated that he could not say with any certainty how time spent in foster care would affect earning capacity. At any rate, the jury did not reach the question of damages, as it found for the Appellees on the question of liability. It was not error to admit this evidence or again at most a harmless error, given that damages were not determined.

## II.   Jury Instructions

Combs alleges the circuit court erred in two main ways in its jury instructions. First, she claims the instructions should not have included an "act of God" defense. She further argues that comparative fault of Bryce should not have

been presented to the jury. "Alleged errors regarding jury instructions are considered questions of law that we examine under a *de novo* standard of review." *Hamilton v. CSX Transp., Inc.*, 208 S.W.3d 272, 275 (Ky. App. 2006).

"[O]rdinarily the action of natural forces, in order to be classed as an 'Act of God,' must be of an unforeseeable and unpredictable character, the consequences of which could not be guarded against." *Chesapeake & O. Ry. Co. v. Biliter*, 413 S.W.2d 894, 898 (Ky. 1967). "It is familiar law that if an accident is due to the combined effects of an act of God and human negligence, the injury is considered the proximate result of the negligence." *Kentucky Power Co. v. Kilbourn*, 307 S.W.2d 9, 13 (Ky. 1957).

In her brief, Combs argues "a negligently designed, constructed and maintained manmade structure caused the accident."[5] This is debatable, and a premise that was rejected by the jury. One could certainly argue that a 200-500-year storm could qualify as an "act of God." The circuit court correctly explained the act of God defense. The jury rejected the defense and decided the case based on an absence of negligence. This argument is moot.

Combs next argues that the jury should not have been instructed as to Bryce's comparative negligence. Instruction No. 7 read "[y]ou are instructed that at the time and on the occasion about which you have evidence, that Bryce Combs

---

[5] Appellant's Brief, Page 32.

had a duty to exercise ordinary care for his own safety." Interrogatory No. 7 asked "[d]o you believe from the evidence that Bryce Combs failed to exercise his duty as set forth in INSTRUCTION NO. 7, and that such failure was a substantial factor in causing his death?" The jury responded "Yes" to this interrogatory.

Combs insists that this instruction and interrogatory were inappropriate as this action was one for attractive nuisance. In an attractive nuisance claim,

> [a] possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if
>
> > (a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and
> >
> > (b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and
> >
> > (c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and
> >
> > (d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and

> (e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children.

*Hayes v. D.C.I. Properties-D KY, LLC*, 563 S.W.3d 619, 624 (Ky. 2018).

"Comparative negligence calls for liability for any particular injury in direct proportion to fault. As opposed to contributory negligence, where the plaintiff's negligence can be a complete defense, comparative negligence shift[s] the focus of attention from liability to damages, and . . . divide[s] the damages between the parties who are at fault. A finding of fault involves an examination of the duties of each party and a determination of whether those duties were breached." *Regenstreif v. Phelps*, 142 S.W.3d 1, 4 (Ky. 2004) (internal quotation marks and citations omitted). Combs essentially argues that, by placing a burden of duty of care on Bryce, the circuit court effectively ruled that Bryce was not entitled to make an attractive nuisance claim, which is inconsistent with the remainder of the jury instructions.

Previously, our courts have held that children of age fourteen and older are not entitled to the benefit of the attractive nuisance doctrine. *See Chesser v. Louisville Country Club*, 339 S.W.2d 194, 196 (Ky. 1960). "Although we no longer adhere to a strict age cutoff, *e.g.*, children under fourteen years of age, a child must be unable to appreciate the risk involved in intermeddling with the condition." *Hayes*, 563 S.W.3d at 625. Bryce was nine years of age. The inquiry

then becomes if Bryce was able to appreciate the risk involved in playing in a flume full of rushing water. It's also important to note that Bryce was not actually a trespasser in this action. The flume was on Housing Authority property, and Bryce was a resident of the Authority.

The circuit court appeared to accept that the attractive nuisance doctrine may have applied to Bryce, as evidenced by its numerous interrogatories (4A-4E and 5A-5E) to the jury, which laid out the factors of attractive nuisance. If this is the case, then it naturally follows that the circuit court believed Bryce may not have fully appreciate the risks involved. But the jury answered all the interrogatories in a way to indicate no negligence by the Appellee regardless of the theory advanced by Combs.

We note that the question of comparative negligence became moot when the jury found no negligence of any defendant. We agree that the jury should not have been asked to assess percentages of fault for Bryce or Combs. It should not have been required to add insult to injury by assessing a percentage of fault to Combs. When the jury answered the questions resulting in no finding of negligence by any defendant, they should have been instructed to return to the courtroom. There was no reason to determine if Bryce or his mother were to blame or the amounts of any possible damages.

### III. Adkins Deposition Testimony

Combs argues the circuit court erred in allowing the City to play Adkins' deposition testimony rather than requiring her to testify live at trial. A decision to allow deposition testimony is reviewed for abuse of discretion. *See Ball v. Osborne's Adm'r*, 226 S.W.2d 789, 791 (Ky. 1950); *Shields v. Commonwealth*, 647 S.W.3d 144, 150 (Ky. 2022). Likewise, the determination of whether a witness is sufficiently "unavailable" in order to allow deposition testimony is reviewed for abuse of discretion. *Bruce v. Commonwealth*, 441 S.W.2d 435, 437 (Ky. 1969). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair or unsupported by sound legal principles." *Woodard v. Commonwealth*, 147 S.W.3d 63, 67 (Ky. 2004).

The use of depositions in lieu of live testimony is governed by CR[6] 32.01. This provision states:

> At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:
>
> > (c) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds the witness: . . . (x) is prevented

---

[6] Kentucky Rules of Civil Procedure.

from attending the trial by illness, infirmity, or imprisonment[.]

The applicable rule of evidence that controls this issue is KRE 804(b)(1), which states:

> (b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> > (1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

The City claimed Adkins was unavailable to testify because she had informed the City that someone in her household was positive for COVID-19 and that Adkins believed she had it as well. The City's counsel who spoke with Adkins stated to the circuit court that Adkins sounded very ill on the telephone. No further evidence was presented to corroborate this statement.

Combs states that Adkins had not been disclosed as a witness in discovery prior to her deposition. Therefore, she argues she did not have an opportunity to meaningfully cross-examine Adkins at the deposition.

Finally, Combs argues Adkins' testimony was double-hearsay, and therefore inadmissible. In response, Appellees contend that the small portion of

-23-

Adkins' deposition that was played only contained statements Combs herself made to Adkins, rendering those statements admissible under KRE 801A(b)(1).

Adkins' deposition took place on December 2, 2021. Combs' counsel was present for the deposition and did cross-examine Adkins during the deposition. While it is true that several portions of Adkins' deposition contained hearsay statements, those statements were not played for the jury. The only parts of the deposition played at trial were of those statements Adkins claimed that Combs made directly to her. The parties and the circuit court spent over an hour going over the deposition in order to make sure only those admissible statements were shown to the jury. These were properly admitted pursuant to KRE 801A(b)(1). It was not an abuse of discretion to allow this deposition testimony to be admitted.

### IV.   Howard Deposition Testimony

Combs next argues the circuit court erred in excluding the deposition testimony of Kevin Howard ("Howard"), an expert witness the City had previously disclosed. The City decided not to call Howard to testify. Combs then wished to play very small portions of Howard's deposition testimony. The circuit court did not allow Combs to play this testimony. Again, "the standard of review of an evidentiary ruling is abuse of discretion." *Cox v. Commonwealth*, 553 S.W.3d 808, 814 (Ky. 2018).

Combs alleges in her brief that the circuit court's reasoning for not allowing the deposition testimony is that Howard was the City's designated expert. But that is not the reasoning the circuit court gave, at least as far as the record illustrates. The discussion that occurred between the parties and the circuit court on the record indicates the court's reasoning being that playing such a small part of the deposition would be confusing to the jury. The circuit court stated that while it was standard to redact portions of deposition testimony, it is not standard to select only a few statements to be played to the jury, while excluding the remainder of the testimony. While it is possible that another discussion took place where the circuit court expressed a hesitation to admit based on Howard being the City's expert, this discussion was not on the record. Likewise, Combs' claim that Howard is an unavailable witness as he resides more than 100 miles from Rowan County is stated for the first time in her brief, and we therefore do not consider it. *See Knott County Bd. of Educ. v. Patton*, 415 S.W.3d 51, 56 (Ky. 2013).

Regardless, Howard's deposition is not the silver bullet against the City that Combs claims it to be. Combs claims that Howard "in his deposition he detailed multiple ways the storm sewer structures at issue violated the 1958 HUD Minimum Construction Standards."[7] Howard's statements in his deposition are not as clear-cut as this assertion suggests. Howard cites the Federal Housing

---

[7] Appellant Brief, page 30.

Administration's Minimum Property Standards that were published on November 1, 1958. Specifically referenced is Section 1203, titled "Drainage Structures." The relevant portions of this section state:

> 1203.2.1 Paved gutters, drain lines and inlets or other necessary drainage structures shall be installed where storm water disposal cannot be obtained without their use or where erosion cannot be prevented by finish grading and planting.

> 1203-2.2 Design, construction, and installation of drainage structures shall be in accordance with standard engineering practice and suitable for the use and maintenance contemplated.

During the deposition, Combs' counsel asked Howard if the Authority could have just built a larger underground pipe instead of a surface flume to carry water to the creek. Howard responded that would have been another option, but he does not specifically say whether either option was against standard engineering practice. He simply states: "Well, like I said, that's – that's an alternative. Whenever you're working on your designs, you come up with Alternative A, Alternative B, Alternative C. And people don't always pick the alternate you think they're going to pick."[8]

Howard does seem to infer that the structure would not meet today's standards. He stated: "And that's the reason I was trying to come up with an opinion of what this would do in comparison to some of the modern standards.

---

[8] Kevin Howard Deposition, Pages 110-111.

And most communities would probably have demanded 100 year pipe today.  But in 1966, they just weren't there."[9]

There are several occasions when Combs' counsel asks Howard if the flume and the pipe were against standards.  Howard never explicitly stated that they were.  He also specifically stated he was making no opinion of whether the flume was safe.  It was not an abuse of discretion for the circuit court to exclude the potentially out-of-context excerpts from Howard's deposition.  The evidence offered if admitted may have resulted in confusion of the issues and a waste of time in the circumstances.

**V.    Juror Misconduct**

Combs argues her motion for a new trial should have been granted on the basis of juror misconduct.  Combs' friend and witness, Betty Whitaker, provided an affidavit to the circuit court that she overheard several of the jurors discussing the case amongst themselves and making statements that they had already made up their minds in violation of the admonition of KRS 29A.310(1).

KRS 29A.310 states:

(1) If the jury is permitted to separate, either during the trial or after the case is submitted to them, they shall be admonished by the court that it is their duty not to converse with, nor allow themselves to be addressed by, any other person on any subject of the trial; and that, during the trial, it is their duty not to form or express an

---

[9] Kevin Howard Deposition, page 124.

opinion thereon, until the case is finally submitted to them.

Whitaker described three jurors by physical appearance and clothing worn on the day she heard their statements. "Facts stated in an affidavit supporting a motion for new trial will be taken as true unless countered." *Butler v. Commonwealth, Dep't of Highways*, 387 S.W.2d 867, 868 (Ky. 1965). An affidavit can be countered by affidavits of others, including the jurors themselves. *Id.*

"[T]he trial judge is in the best position to determine the nature of alleged juror misconduct and the appropriate remedies for any demonstrated misconduct. A trial judge's factual findings are reviewed only for clear error." *Graham v. Commonwealth*, 319 S.W.3d 331, 337 (Ky. 2010), *as modified* (Sep. 10, 2010) (internal quotation marks and citations omitted). "A trial court's denial of an Appellant's new trial motion is reviewed for abuse of discretion." *Crawford v. Marshall Emergency Servs. Assocs., PSC*, 431 S.W.3d 442, 444 (Ky. App. 2013).

The circuit court held a hearing on Combs' motion for new trial on July 14, 2023. Whitaker's affidavit was countered by an affidavit by the jury foreperson, who believes she was the person referenced in Whitaker's affidavit making the alleged statement. The foreperson denied ever making this statement, and she claimed to have not heard any other juror making any similar statements.

As previously referenced, Combs did not bring Whitaker in to testify at her motion for new trial. The evidence submitted on this issue was competing

affidavits.  The jury foreperson, the juror alleged to have made the most prejudicial statement to Combs, denied making the statement in her own affidavit.  "The trial judge still determines the issue of credibility in this area."  *Duncan v. O'Nan*, 451 S.W.2d 626, 629 (Ky. 1970).  The circuit court determined there was not sufficient basis to overturn the unanimous verdict of the jury.  The witness who made the affidavit was very close with Combs, and she waited approximately two months to make the disclosure that she had overheard the statements made.  There was evidence contradicting Whitaker's affidavit.  It was not an abuse of discretion to deny Combs' motion for a new trial on this basis.

We note the other alleged statement of another juror supposedly saying: "we shouldn't have to sit through three more days this, because I already have my mind made up," while another juror nodded to this statement.  The identity of this juror was never established.  This statement is analogous to the statement in *Crawford*, *supra*, which this Court determined to be "too vague to warrant an inference of prejudice."  *Crawford, supra*, 431 S.W.3d at 448.  The statement alone, if actually uttered, does not indicate an opinion either in favor or in opposition to Combs.  Again, it was not an abuse of discretion to deny Combs' motion for a new trial on this basis.

## VI.  Jury Verdict

Combs submits that the circuit court should have granted her motion for a new trial because the jury's verdict was not supported by the evidence.

> The role of the appellate court when deciding negligence issues of this sort is limited to viewing the evidence from a standpoint most favorable to the prevailing party.  In negligence cases such as this one the verdict of the jury resolves any conflicts in the testimony and also any conflicts in the reasonable inferences to be drawn from the testimony in favor of the prevailing party. . . .  In short, an appellate court must not substitute its findings of fact for those of the jury if there is evidence to support them.

*Bayless v. Boyer*, 180 S.W.3d 439, 451 (Ky. 2005) (citing *Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382, 385 (Ky. 1985)).  "[A]ppellate review of a trial court ruling on a motion brought pursuant to CR 59.01 is subject to the clearly erroneous standard, and requires a great deal of deference to the trial court."  *Id.*

"The standard for reversing jury verdicts is admittedly high," and a jury verdict should not be disturbed if supported by substantial evidence. *Shreve v. Biggerstaff*, 777 S.W.2d 616, 618 (Ky. App. 1989).  "The decision of the trial court will stand unless it is determined that the verdict rendered is palpably or flagrantly against the evidence so as to indicate that it was reached as a result of passion or prejudice." *Indiana Ins. Co. v. Demetre*, 527 S.W.3d 12, 25 (Ky. 2017) (internal quotation marks and citations omitted).

Combs argues the jury's defense verdict is not supported by the evidence because all the evidence indicated that the City and the Housing Authority breached their duties. She argues the jury was prejudiced by the inadmissible character evidence discussed above.

Combs cites *Mason v. City of Mt. Sterling*, 122 S.W.3d 500 (Ky. 2003), for the contention that the City has a ministerial duty to non-negligently construct, maintain, and repair sewer lines. We do not disagree that the duty applies here, and neither did the circuit court. The jury in this case was instructed that the City had a duty to maintain the storm sewer in a reasonably safe condition for persons affected by storm water.

But *Mason* is distinguishable here. The Kentucky Supreme Court in *Mason* determined that summary judgment in favor of the City of Mt. Sterling was inappropriate, as the factual question of whether or not the city properly maintained its storm sewer system needed to be decided. The Court determined there were multiple fact questions that should be presented to a jury, not determined on summary judgment. In this case, a jury did hear all the evidence but found against Combs on those facts.

Combs repeatedly insists that the City and Authority breached their duties. Despite her claims that the evidence of this was unrebutted, Combs did not present any specific evidence of what the City or the Authority should have done,

but did not do, to prevent this tragedy. She presented expert testimony that having the larger 30-inch pipe empty into the smaller 22-inch pipe was not standard engineering practice, but this expert did not state that the system would not have overflowed if it was built differently. Combs presented evidence that no one had cleaned out the catch basin prior to the storm's arrival, but again, no one testified that the catch basin was clogged the day of the storm, or that it would have made a difference if it had been cleared. Combs did elicit testimony from City and Authority employees that they did not have a regular maintenance schedule, and many of the city employees were generally unaware of the location of many of the storm drains. But again, no evidence was presented that Bryce would not have drowned had these faults not occurred.

Even if we assume for the sake of argument that a breach of duty is unrefuted, the inquiry of liability doesn't end there. A claim for wrongful death is, essentially, a negligence claim. *See Patton v. Bickford*, 529 S.W.3d 717, 729 (Ky. 2016). "The elements of a negligence claim are (1) a legally-cognizable duty, (2) a breach of that duty, (3) causation linking the breach to an injury, and (4) damages." *Id.* Combs also had to prove that the City and Authority's breaches of duty were the *cause* of Bryce's death.

Several witnesses testified they had never seen the water in the flume or in Town Branch Creek so high before. There was expert testimony that the

amount of rainfall that accumulated during this storm categorized it as anywhere from a 50-500 year event. There was also expert testimony that, with this amount of rainfall, most storm drainage systems would be overwhelmed, and that many drowning risks would occur that would not ordinarily occur.

Because of the way the jury interrogatories were written, we cannot determine if the jury did not believe that the City had breached its duty, or that they did not believe that breach was the cause of Bryce's death. Either way, these questions are fact questions for the jury, and there was sufficient evidence to support them. And either way the jury verdict precludes a finding of liability against these Appellees.

## CONCLUSION

Bryce tragically lost his young life, a life with untold promise. We sympathize with Ms. Combs in the immeasurable loss she has sustained. But we must evaluate whether there was any error in the determination that this tragedy was not the fault of the Appellees due to negligence. The jury, after considering a great deal of evidence, said it was not. We cannot conclude that the circuit court erred in this case in any way to justify reversal. Therefore, we AFFIRM the Rowan Circuit Court.


ALL CONCUR.

BRIEFS FOR APPELLANT:

Mickey T. Webster
Lexington, Kentucky

BRIEF FOR APPELLEE CITY OF
MOREHEAD, KENTUCKY:

Erica K. Mack
Jeffrey S. Walther
John K. Wood
Lexington, Kentucky

BRIEF FOR APPELLEE HOUSING
AUTHORITY OF MOREHEAD:

Katherine J. Hornback
Lexington, Kentucky